UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NUMBER: 3:01CR17 (CFD) |
| | : | |
| v. | : | July 22, 2005 |
| | : | |
| EDMUND FUNARO, JR. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

**Introduction**

Defendant Edmund Funaro, Jr. ("Funaro") was found guilty by jury verdict of 27 counts of illegal dispensation of controlled substances, in violation of 21 U.S.C. § 841(a)(1). The Presentence Report ("PSR") recommends that the Court calculate the defendant's total offense level to be level 28, yielding a Guidelines Sentencing Range of 78 to 97 months of imprisonment, and a fine range of $12,500 to $125,000. If Funaro is sentenced to imprisonment, the Court is required to impose a term of supervised release of at least three years. See 21 U.S.C. § 841(b)(1)(C). Funaro will also be required to pay $2,700 in special assessments. Sentencing is scheduled to occur on August 4, 2005. The Government believes that a sentence at the low end of the recommended Guidelines Sentencing Range is appropriate in this case.

**Facts**[1]

Between March 1, 1998, and June 5, 2000, Funaro was a pharmacist at, and owner of, Visels Pharmacy ("Visels"), located at 714 Dixwell Avenue, New Haven, Connecticut. Between

---

[1] As of the date of filing of this memorandum, Funaro has not raised any material objections to the factual portion of the PSR.

those dates, Visels filled approximately 3052 prescriptions for controlled substances written by co-defendant William J. Massie, M.D. ("Massie").

Beginning in or about September 1999 and continuing through 2000, Connecticut State Drug Control, the Drug Enforcement Administration ("DEA"), and other agencies conducted a criminal investigation of Massie. The agents were able to carry out audio and video surveillance of individuals obtaining prescriptions for controlled substances from Massie without medical examination. The agents learned that Massie charged $50 in cash to write prescriptions for these substances and generally did not take any form of insurance. Massie's patients would form lines outside his office, given that he did not accept appointments. On occasion, Massie gave prescriptions to patients at Sports Haven, an off-tracking betting establishment in New Haven. As result of this investigation, Massie was arrested on June 5, 2000.

The agents learned through their surveillance efforts and through cooperative witnesses that patients of Massie were selling the controlled substances obtained by way of Massie's prescriptions outside of his office, and that some of those prescriptions were being filled at local pharmacies, including Visels and Arrow Pharmacy ("Arrow"). In connection with these efforts, in early June 2000 the agents sought state search and seizure warrants for medical records located in Massie's office, and for prescriptions written by Massie and filled at Visels and Arrow. At Visels, the agents seized approximately 3000 prescriptions written by Massie for controlled substances. These substances included Percocet, Vicodin, Tussionex, Xanax, Valium, and Klonopin. State search warrants were also executed at a number of other New Haven area pharmacies.

In addition, the agents conducted a survey of New Haven area pharmacists regarding the filling of Massie's prescriptions. The survey revealed that many New Haven area pharmacists had stopped filling Massie's prescriptions years earlier, in many instances because they were concerned that Massie was not prescribing legitimately.

The agents entered the data obtained from the approximately 15,000 Massie prescriptions seized from various New Haven area pharmacies into a database. The database revealed that five pharmacists in the New Haven area filled the vast majority of Massie prescriptions during the relevant time period. Those pharmacists were Edmund Funaro, Jr., Edmund Funaro, Sr. (also a pharmacist and owner of Visels), Konstantinos Melanidis of Arrow, Frederick Santa of K-mart on Foxon Road in New Haven, and John Wozniak of Rite Aid on Ferry Street in New Haven. Based on these findings, these pharmacists emerged as additional targets of the investigation.[2] After being indicted with Funaro, Massie, Helen Umstead, William Calash, and Paul Caponera on various Title 21 drug charges, co-defendants Melanidis, Santa, and Wozniak each pleaded guilty in 2001 to substitute informations charging them with violating 18 U.S.C. § 1001 (false statement), and were each sentenced to 18 months of probation, varying fines, and restitution. Funaro elected to take the case to trial.

At the trial, evidence was presented that approximately 88 percent of the prescriptions filled by Massie customers at Visels during the March 1998 and June 2000 period were for controlled substances. The Government's expert witness, Dr. James O'Brien, testified that this was an extremely high percentage of controlled substance for a general practitioner. The

---

[2]     Although Funaro, Sr. was viewed as a potential target once the results of the database became apparent, the Government opted not to charge him.

evidence also showed that Massie generally prescribed the substances in very similar quantities and dosages for the vast majority of patients. Of the 3052 Massie prescriptions filled at Visels, Funaro, Jr. dispensed approximately 1417 of them. Of these prescriptions filled by Funaro, Jr., more than 280 constituted either an early filling that was at least three days early, or a therapeutic duplication, which consists of a prescription for a controlled substance filled within the coverage period of a prescription for another controlled substance having the same pharmacological effect. These patterns indicated that Massie was prescribing controlled substances outside the normal scope of medical practice and not for a legitimate medical purpose.

      The evidence demonstrated that Funaro was in a position to see these and other red flags concerning Massie's prescriptions. In addition, State Drug Control Agent Deborah Komoroski and DEA Diversion Investigator Leonard Levin gave uncontradicted testimony that Funaro told them during an April-May 1999 audit that the vast majority of Massie's patients received prescriptions for controlled substances. In addition, Funaro acknowledged to the agents during the audit that he should not be filling Massie's prescriptions early; said that he would not do so in the future; and told Levin that he would contact him if Massie's patients came into Visels with more early prescriptions.[3] Funaro also told the agents that Massie's patients had drug problems and were questionable. When asked why he filled Massie's prescriptions for controlled substances if Massie's patients had drug problems and were questionable, Funaro told the agents that it was their job to police Massie, not his, and that if they were not going to do anything about Massie, he would continue to fill Massie's prescriptions as long as Massie was licensed and had

---

[3] No doubt the jury found it revealing that Funaro never called Levin or Komoroski about additional early prescriptions, even though Massie's patients continued to bring in early prescriptions in the months following the April-May 1999 audit.

a controlled substance registration. Funaro's conduct, as adduced at trial, was plainly contrary to a pharmacist's corresponding responsibility not to fill a prescription if there is reason to believe that it was prescribed outside the scope of professional practice and not for a legitimate medical purpose. See 21 C.F.R. § 1306.04(a).

## Sentencing Calculation

The PSR calculates Funaro's Guidelines Sentencing Range to be 78-97 months. However, Funaro will presumably argue that the Court should sentence him below that range either by way of downward departure or in a non-Guidelines sentence. The Government respectfully suggests that a sentence at the low end of the advisory Guidelines range is appropriate in this case.

A.   *Booker/Fanfan* and *Crosby*

In United States v. Booker, ___ U.S. ___, 125 S. Ct. 738 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 542 U.S. 296 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 125 S. Ct. at 757. This ruling results in a system in which the sentencing court, while informed by the Guidelines, may impose any sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to review by the Court of Appeals for "reasonableness." Id. at 766; see also United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).

In the wake of Booker/Fanfan and Crosby, this Court must make a calculation under the existing Sentencing Guidelines, and then consider the final guideline calculation when determining the sentence to be imposed. See Booker, 125 S. Ct. at 767 (holding that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing"); Crosby, 397 F.3d at 111-12. The Second Circuit has further instructed that "that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after Booker/Fanfan, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

The position of the United States is that, absent highly unusual circumstances, the sentence in a criminal case should fall within the guideline range as determined by the Court. This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in Booker recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. See, e.g., Booker, 125 S. Ct. at 761 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); Crosby, 397 F.3d at 114 ("We have every confidence that ... [district courts'] sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of 15 years of careful study of sentencing practices across the country,

and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing, and should occur absent unusual circumstances. Accordingly, a sentence within the guideline range is presumptively reasonable, and accommodates the congressional purpose, affirmed by the Supreme Court, of imposing fair sentences which are uniform to the extent possible.

  B. <u>Application of *Booker/Crosby* to This Case</u>

In this case, no circumstances exist that are so unusual that they warrant an exception to the preference for guideline sentencing. Therefore, the Government respectfully recommends that the Court sentence the defendant within the Guidelines range calculated in the PSR.

Pharmacists fall directly within the scope of conduct proscribed by the Controlled Substance Act. One court has noted that 21 U.S.C. § 841, the statute under which Funaro was

convicted, "does not exempt pharmacists who sell narcotic drugs without prescriptions, nor does it suggest that their conduct is somehow less seriously wrong than the conduct of non-pharmacist drug dealers. On the contrary, the statute applies to the two groups' conduct in the same way." United States v. Limberopoulos, 26 F.3d 245, 249 (1st Cir. 1994). Funaro and other pharmacists who have been convicted of violating section 841 may not be "typical" defendants under that statute. However, Funaro's conduct in dispensing controlled substances illegally falls within the "heartland" of that provision. See id.

In this case, the jury was presented with evidence that Funaro filled hundreds of illegitimate prescriptions written by Massie. There was evidence that Funaro was aware Massie was feeding the drug addictions of Visels' customers. Given this knowledge, Funaro, like most other New Haven area pharmacists, should have refused to fill Massie's prescriptions, especially the repeated early fills and therapeutic duplications. A pharmacist may not be in the examining room to see what goes on between doctor and patient, but when, as in this case, the pharmacist nevertheless knows that the doctor is prescribing illegitimately, the pharmacist has to fulfill his corresponding duty not to fill that doctor's prescriptions. Funaro's willful disregard of his legal duty resulted in substantial amounts of illegally prescribed controlled substances hitting the street. As Dr. O'Brien testified, these substances are highly addictive and are extremely dangerous when used improperly. Funaro should have been a gatekeeper. Had he done his duty, a substantial amount of dangerous drugs would not have been dispensed to addicts and others who were engaged in drug diversion. Instead, Funaro facilitated addictions to and diversion of controlled substances.

In the Government's view, Funaro's conduct warrants a sentence within the 78-97 month Guidelines Sentencing Range. Such a sentence is appropriate for several reasons, including the just punishment that it will impose on Funaro for his egregious conduct and the general deterrent effect it will have on other pharmacists and health care professionals who are tempted to engage in similar activity. The Government believes that a sentence at the low end of the recommended range would be sufficient to serve these and the other purposes of federal sentencing as enumerated in 18 U.S.C. § 3553(a).

          Respectfully submitted,

          KEVIN J. O'CONNOR
          UNITED STATES ATTORNEY


          GEOFFREY M. STONE
          Assistant United States Attorney
          Federal Bar No. ct25326

For:    JONATHAN BIRAN
          Assistant United States Attorney
          Federal Bar No. ct21922
          United States Attorney's Office
          157 Church Street, 23rd Floor
          New Haven, CT 06510
          (202) 821-3700

CERTIFICATE OF SERVICE

This is to certify that on July 22, 2005, a copy of the foregoing was served on the following persons:

Alan J. Sobol, Esq. (by fax and U.S. mail)
O'Connell, Flaherty & Attmore, L.L.C.
280 Trumbull Street
Hartford, CT 06103-3598

Jacqueline Carroll (by hand delivery)
U.S. Probation Officer
U.S. Probation Office
157 Church Street
New Haven, CT 06510

                GEOFFREY M. STONE
                ASSISTANT U.S. ATTORNEY

For:    JONATHAN BIRAN
         ASSISTANT U.S. ATTORNEY