## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | DOCKET NO.: |
| | : | 3:01CR00017 (CFD) |
| EDMUND FUNARO | : | |
| | : | JULY 22, 2005 |

### MEMORANDUM IN AID OF SENTENCING

The Defendant, Edmund Funaro, Jr., submits this Memorandum as an aid to the Court

in sentencing and in support of his request for leniency (downward departure).  The defendant

acknowledges the recent United States Supreme Court opinion which struck down the

mandatory nature of the Federal Sentencing Guidelines (hereafter "Guidelines") but also

recognizes the Supreme Court and Second Circuit's mandate that the district courts continue

to "consult" the Guidelines during sentencing, United States v. Booker, 2005 U.S. LEXIS 628

at *80 (Jan. 12, 2005), and determine the applicable Guideline range whether or not the judge

decides to impose a non-Guideline sentence.  United States v. Crosby, 2005 U.S. App. LEXIS

1699, at *18-19 (2d Cir. Feb. 2, 2005).  As a result, this memorandum in aid of sentencing

discusses factors in relation to sentencing under the Guidelines which would have ordinarily

been discussed prior to the Booker decision striking down the Guidelines in addition to an

analysis of the sentencing factors outlined in 18 U.S.C. §3553(a).  Part I of this Memorandum

briefly addresses the defendant's adjusted offense level within the Guidelines.    Part II addresses the issue of leniency/downward departure.

Edmund Funaro, Jr. respectfully requests that, because of (1) his exceptional and compelling family ties and personal circumstances; (2) charitable acts, good deeds and status as a community employer; (3) health concerns; and (4) the Guidelines overstated nature of his criminal offense conduct, that he be sentenced to a term of probation and/or supervised release (including home confinement), or, alternatively, if the Court is inclined to impose a sentence of incarceration, that the Court sentence him to an appropriate medical facility close to his family.[1]

**Part I – Adjusted Offense Level Within the Guidelines.**

On November 21, 2003, Edmund Funaro appeared in the United States District Court at Hartford, Connecticut, before the Honorable Christopher F. Droney, United States District Judge, and was found guilty by jury verdict on Counts One through Twenty Seven of a Second Superseding Indictment charging him with Illegal Dispensation of Controlled Substances in violation of 21 U.S.C. §841(a)(1) and (b)(1)(C). [2]

---

[1] The Defendant respectfully recommends FMC Devens in nearby Massachusetts as an appropriate facility to accommodate the defendant's medical needs and family concerns.

[2] Mr. Funaro was one of eight original co-defendants in this matter, including William J. Massie, M.D., Helen Umstead, William Calash, Paul Caponera, Konstantinos Melanidis, John Wozniak and Frederick Santa. William J. Massie, M.D. died shortly after the original Indictment was returned. The remaining co-defendants pled guilty

At all times relevant, Mr. Funaro was a Registered Pharmacist properly licensed by the State of Connecticut and the United States Drug Enforcement Administration to handle and dispense controlled substances pursuant to lawfully issued prescriptions. Mr. Funaro was part owner of Visel's Pharmacy, a community pharmacy and retail convenience store serving the inner city, minority population of New Haven, Connecticut, located at 714 Dixwell Avenue and in continuous operation since 1912. Visel's Pharmacy has been operated by the Funaro family for approximately the last forty years.

The charges against Mr. Funaro stem from a joint investigation by agents from the Drug Enforcement Administration (hereafter "DEA") and the State of Connecticut into illegal distribution of controlled substance prescription medications by William J. Massie, M.D., a licensed physician who operated a medical office on Dixwell Avenue in New Haven, Connecticut, not far from Visel's Pharmacy.[3] In 1997, the State of Connecticut Drug Control Division (hereafter "Drug Control") conducted an audit of Visel's Pharmacy that revealed shortages on some of the audited controlled substances. Drug Control scheduled another follow-up audit of Visel's Pharmacy the following year, purportedly to determine whether

---

to charges ranging from Possession of Narcotics to Conspiracy to Distribute a Controlled Substance to Making a False Statement.

[3] Only the Government's version of the offense is contained in the Pre-Sentence Report. The Defendant has a different version of the facts leading up to his arrest and ultimate conviction on the instant charges, and did put on a full defense at the trial of this matter.

3

various issues uncovered in the 1997 audit had been remedied. Concurrently, Drug Control and DEA agents became interested in the activity of William J. Massie, M.D., regarding possible criminal activity in connection with his issuance of controlled substance medication prescriptions. That interest evolved into a full-scale undercover operation involving covert audio and video surveillance, cooperating witnesses and informants. It is undisputed that neither Mr. Funaro nor Visel's Pharmacy was ever the subject of any audio and video surveillance at any time.[4]

In June of 1999, Drug Control and DEA conducted a follow-up audit of Visel's Pharmacy where certain discrepancies in record keeping were noted and where agents observed an alleged high volume of controlled substance prescriptions written by Dr. Massie, and at which Mr. Funaro allegedly made several statements concerning Dr. Massie and Funaro's practice in filling Massie's controlled substance prescriptions.[5]

The criminal investigation into Dr. Massie culminated with Drug Control and DEA, as well as other state and federal agencies, executing search warrants at both Dr. Massie's

---

[4]It is noteworthy that Mr. Funaro maintained his innocence throughout this entire case and chose to go to trial instead of plead guilty to a lesser offense as his pharmacist co-defendants did. Mr. Funaro still maintains his innocence to this day.

[5]Mr. Funaro filed a pre-trial Motion to Suppress the information obtained by Drug Control and DEA during this purported audit, and all evidence derivatively obtained therefrom, including his alleged statements, on the grounds that the information was obtained in violation of both federal statute and Mr. Funaro's Fourth Amendment rights, however the Motion was denied by the Court. See United States v. Funaro, 253 F. Supp. 2d 286 (D. Conn. 2003).

medical office and home in June of 2000. Additionally, agents executed search warrants at several area pharmacies, including Visel's Pharmacy. After several months of digesting all the information obtained as a result of the search warrants, Drug Control and DEA claimed that four pharmacists, including Mr. Funaro, emerged as additional targets of the Dr. Massie criminal investigation.[6] Pre-Sentence Report (hereafter "PSR") at ¶¶ 4-25.

In the PSR, the Probation Office calculated Edmund Funaro as having a base offense level of 26 for violation of 21 U.S.C. §841(a)(1), an offense involving Drugs and Unlawful Manufacturing, Importing, Exporting or Trafficking. (U.S.S.G. §2D1.1; PSR at ¶ 37).[7] The Probation Office determined that Mr. Funaro abused a position of trust and special skill, as evidenced by his pharmacy license, in a manner that significantly facilitated the commission of the instant offense, and adjusted Mr. Funaro's offense level upward by two (2) levels pursuant to U.S.S.G. §3B1.3. (PSR at ¶ 39). The Probation Office found no other aggravating Specific Offense Characteristics (PSR at ¶ 38), Victim Related Adjustments (PSR at ¶ 40) or other adjustments for Obstruction of Justice, (PSR at ¶ 41), resulting in an Adjusted Offense Level of 28. (PSR at ¶ 42). The Probation Office declined to give Mr. Funaro any downward adjustment for Acceptance of Responsibility, citing the fact that Mr. Funaro put the

_____

[6] Mr. Funaro's pharmacist co-defendants all received sentences of short terms of probation. (PSR at ¶ 82).

Government to its burden of proof and was convicted by a jury verdict (PSR at ¶ 34), resulting in a Total Offense Level of twenty eight (28). (PSR at ¶ 44).

Mr. Funaro has no prior criminal history whatsoever, (PSR at ¶ 45), giving him zero criminal history points, and placing him in a Criminal History Category of I. (PSR at ¶ 46). There are no identifiable victims in this matter. (PSR at ¶ 33).

The Probation Office determined that the maximum term of imprisonment for Counts One through Four, Six, Eight through Eleven and Twenty-Three is 20 years pursuant to 21 U.S.C. §841(b)(1)(C). (PSR at ¶ 67). The Probation Office determined that the maximum term of imprisonment for Counts Twelve through Fourteen, Sixteen, Eighteen, Twenty through Twenty-Two, Twenty-Four and Twenty-Five is 5 years pursuant to 21 U.S.C. §841(b)(1)(D). The Probation Office also determined that the maximum term of imprisonment for Counts Five, Seven, Fifteen, Seventeen, Nineteen, Twenty-Six and Twenty-Seven is 3 years pursuant to 21 U.S.C. §841(b)(2). (PSR at ¶ 67). Based upon a Total Offense Level of 28 and a Criminal History Category of I, the Probation Office determined that the Guidelines imprisonment range is 78 to 97 months. (PSR at ¶ 68).

---

[7] The offense level of 26 includes the relevant conduct evidence introduced during trial, which included some 284 additional prescriptions. However, under U.S.S.G. §2D1.1, the offense level would only be 16 without the additional prescriptions.

If a term of imprisonment is imposed on Counts One through Four, Six, Eight through Eleven and Twenty-Three, a term of supervised release of at least 3 years to life must be imposed pursuant to 21 U.S.C. §841(b)(1)(C). (PSR at ¶ 69). If a term of imprisonment is imposed on Counts Twelve through Fourteen, Sixteen, Eighteen, Twenty through Twenty Two, Twenty-Four and Twenty-Five, a term of supervised release of at least 2 years to life must be imposed pursuant to 21 U.S.C. §841(b)(1)(D). (PSR at ¶ 69). If a term of imprisonment is imposed on Counts Five, Seven, Fifteen, Seventeen, Nineteen, Twenty-Six and Twenty-Seven, a term of supervised release of at least 2 years to life may be imposed pursuant to 21 U.S.C. §841(b)(2). (PSR at ¶ 69). Under the Sentencing Guidelines, the range for supervised release for Counts One through Four, Six, Eight through Eleven and Twenty-Three is 3 years pursuant to U.S.S.G. §5D1.2(b). The Guidelines range for supervised release for Counts Twelve through Fourteen, Sixteen, Eighteen, Twenty through Twenty-Two, Twenty-Four and Twenty-Five is 2-3 years pursuant to U.S.S.G. §5D1.2(a)(2). The Guidelines range for supervised release for Counts Five, Seven, Fifteen, Seventeen, Nineteen, Twenty-Six and Twenty-Seven is not more than 1 year pursuant to U.S.S.G. §5D1.2(a)(3).

Mr. Funaro is authorized for probation pursuant to 18 U.S.C. §3561(a) because the instant offenses are Class C and E felonies. (PSR at ¶ 71). The authorized term of probation for Counts One through Twenty-Seven is not less than 1 year nor more than 5 years pursuant

to 18 U.S.C. §3561(c). (PSR at ¶ 71).  The Sentencing Guidelines do not permit probation. U.S.S.G. §5B1.1, application note 2. (PSR at ¶ 72).

Mr. Funaro is subject to a maximum statutory fine of $1,000,000.00 on each of Counts One through Four, Six, Eight through Eleven and Twenty-Three. 21 U.S.C. §§841(b)(1)(C). (PSR at ¶ 73).  He is subject to a maximum fine of $250,000.00 on each of Counts Five, Seven, Fifteen, Seventeen, Nineteen, Twenty-Six and Twenty-Seven pursuant to 21 U.S.C. §§841(b)(1)(D) and (b)(2). (PSR at ¶ 73).  The Guidelines fine range is $12,500.00 to $1,000,000.00 pursuant to U.S.S.G. §5E1.2(c)(4). (PSR at ¶ 75).  Mr. Funaro is also subject to a special assessment of $2,700.00 pursuant to 18 U.S.C. §3013. (PSR at ¶ 74).  Restitution is not applicable in this matter. (PSR at ¶ 77).

Mr. Funaro has remained at liberty pursuant to a $50,000.00 non-surety bond since January 23, 2001, with conditions requiring him to report to the Probation Office as directed, participate in mental health counseling if necessary, surrender his passport and advise the Probation Office and the United States Attorney's Office of the status of any administrative proceedings by the State of Connecticut. (PSR at ¶ 2).  Mr. Funaro is in compliance with the conditions of his pretrial release.

8

**Personal Circumstances:**

Edmund John Funaro, Jr. was born on April 11, 1960 to Edmund Funaro, Sr. and Janet (nee Raymond) Funaro. (PSR at ¶ 47). He has four siblings: (1) David Funaro, 43 years old, who resides in Durham, Connecticut with his wife and three children and works as a management consultant (PSR at ¶ 48); (2) Carolyn Odegard, 41 years old, who resides in Leesburg, Virginia with her husband and four[8] children and is also a pharmacist (PSR at ¶ 48); (3) Karen Furr, now 40 years old, resides in Southbury, Connecticut with her husband and three children and works as a Registered Nurse (PSR at ¶ 48); and (4) Pamela Swain, 35 years old, who resides in Southington, Connecticut with her husband and three children and is an occupational therapist. (PSR at ¶ 48). Mr. Funaro's father, Edmund Funaro Sr., now 70 years old, is also a pharmacist. He purchased Visel's Pharmacy in the early 1960's and has operated it ever since. (PSR at ¶ 48). Janet Funaro is 67 years old and has assisted in the operation of Visel's Pharmacy, the family business, as a bookkeeper and secretary throughout the years. (PSR at ¶ 48).[9]

Ed Funaro was raised in Cheshire, Connecticut, and spent his adolescence there. He reports that he was raised in a good home with loving, hard working parents. (PSR at ¶ 49).

---

[8] The PSR incorrectly lists Ms. Odegaard as having three children.

[9] The ages of Mr. Funaro's family members as listed in the PSR are now out-dated since the PSR is over one year old. This Sentencing Memorandum lists the current information on each member.

All the Funaro children grew up working in and around Visel's Pharmacy, the family business, in some capacity. (PSR at ¶ 48), and Mr. Funaro has indicated that his family has been and continues to be very supportive of him. (PSR at ¶ 49).

Mr. Funaro attended Cheshire High School from 1974 to 1978. (PSR at ¶ 60). Cheshire High School reports that "[T]his young man was a good student and a good citizen at Cheshire High School." (PSR at ¶ 60). In 1975, Mr. Funaro scored a 127 IQ in the Otis-Lennon School Ability Test. (PSR at ¶ 60). Upon graduating from high school, Mr. Funaro enrolled in the pharmacy program at the University of Connecticut at Storrs, where he received a Bachelor of Science degree in Pharmacy in May of 1983. (PSR at ¶ 61). While in college, Ed met and fell in love with Lisa Santoro, now 45 years old. (PSR at ¶ 50). They married in August of 1984 and settled in a residential neighborhood in Killingworth, Connecticut. (PSR at ¶ 50[10], 51). Ed and Lisa Funaro have three children: (1) Michael Funaro is 19 years old and was a Freshman this year at Penn State University, but was recently withdrawn due to a medical condition which will be explained further below; (2) Danielle Funaro is 17 years old and just graduated from Haddam-Killingworth High School. She was an honor student and aspiring athlete, recently achieving All-State status in track. (PSR at ¶ 50). She will be attending the University of Vermont in the fall in the pre-veterinary medicine

---

[10] The PSR lists an incorrect date for the Defendant's wedding.

program; (3) Jason Funaro, the youngest child, is 12 years old and will be entering the 8th grade. (PSR at ¶ 50).

After graduating from college, Mr. Funaro received his license to practice pharmacy in Connecticut from the Connecticut Pharmacy Commission in 1983, (PSR at ¶ 5), and began working as a pharmacist at Visel's Pharmacy, the Funaro family business. Visel's Pharmacy was incorporated in 1912. (PSR at ¶ 63). Edmund Funaro, Sr. is the third owner of the pharmacy, having taken over its operation in 1964. The business not only provides pharmacy services, but also operates as a retail and convenience store. (PSR at ¶ 63). Visel's Pharmacy is located at 714 Dixwell Avenue in New Haven, Connecticut. (PSR at ¶ 63). Notably, Visel's Pharmacy provides many needed services to the "under served population" in the community (PSR at ¶ 63), mainly composed of low-income minority residents. Many of the store's customers are from the neighborhood, do not have their own transportation and rely on the pharmacy for basic needs, such as pharmacy and medical needs, groceries, purchasing money orders, paying bills and using the services of a notary public. (PSR at ¶ 63). The pharmacy also provides a delivery service for customers who are "shut in". (PSR at ¶ 63).

Throughout his working career, Mr. Funaro has endeavored to help others and improve his community. As such, Visel's Pharmacy and its contributions to the community, made by all the Funaros through the store, has been a source of great pride and

accomplishment for Mr Funaro.  At the trial of this matter, several witnesses testified to the positive impact that Mr. Funaro has had on their lives.  Notably, Ellsworth Simmonds testified that Mr. Funaro allowed him and his elderly wife to purchase their heart medications on a credit installment plan because of their limited financial means and that his wife would not be alive if it were not for Mr. Funaro's help and generosity.  Likewise, Pearlie Boykin testified that Mr. Funaro gave her bread and milk from the store during difficult financial times when she was not otherwise able to purchase food.

Prior to his conviction on the present charges in November of 2003, Mr. Funaro had been employed at Visel's Pharmacy throughout his entire working life, most recently as the pharmacy manager, earning approximately $70,000.00 a year. (PSR at ¶ 62).  As a result of his conviction, and as a condition of his release following the jury verdict, Mr. Funaro has surrendered his pharmacy license (PSR at ¶ 62) and works at the store in a non-pharmacy capacity.

Ed Funaro has never had any substance abuse[11] or mental health problems.  He has a generally positive outlook and regards himself as a positive thinker who "looks to see the good in things." (PSR at ¶ 59).  He is an active person who is very involved in his children's activities, being involved in community basketball, baseball, soccer and boy scouting.  He

considers himself to be a good father and husband, and he considers his family to be the most important thing to him. (PSR at ¶ 59).

**Part II – Downward Departure.**

    **A.    Based on the Defendant's Extraordinary Circumstances.**

    The defendant submits that circumstances are present in this case which, together and in combination, are "of a kind or to a degree not adequately taken into consideration by the Sentencing Commission" and warrant a downward departure.  See 18 U.S.C. Section 3553; U.S.S.G. Section 5K2.0.[12]  In light of Booker, since the Guidelines are now advisory rather than mandatory, Mr. Funaro requests leniency in sentencing rather than a downward departure in the literal sense.  United States v. Booker, 2005 U.S. LEXIS 628  (Jan. 12, 2005). Nonetheless, the defendant employs the pre-Booker arguments for downward departure as a basis for requesting a sentence of probation and/or supervised release (including home confinement).

    This Court has recognized on numerous occasions that personal circumstances outside the heartland of the Guidelines may support a downward departure.  The legal authority to

---

[11]Mr. Funaro reportedly tried marijuana once in high school, however he did not like it and did not use it again. (PSR at ¶ 57).
[12]The Comment to § 5K2.0 explains that if circumstances are present that are not ordinarily relevant to sentencing, such as those listed in U.S.S.G. §5H, to an exceptional degree, or if several circumstances are present to a substantial degree, and taken together make the case an exceptional one, the Court may depart downward.

support a departure on this basis is found in <u>United States v. Rioux</u>, 97 F.3d 648, 663 (2d Cir.

1996), where the Second Circuit recognized that a district court may consider a defendant's

personal circumstances in deciding whether a case warrants departure from the Guidelines.

<u>See also</u> <u>United States v. Adelman</u>, 168 F.3d 84, 86 (2d Cir. 1999). "The Second Circuit has

emphasized that a district court not only can, but must, consider the possibility of a downward

. . . departure 'when there are compelling considerations that take the case out of the heartland

factors upon which the Guidelines rest.'" <u>United States v. Somerstein</u>, 20 F.Supp.2d 454, 460

(E.D.N.Y. 1998) (quoting <u>United States v. Monk</u>, 15 F.3d 25, 29 (2d Cir. 1994)). The Second

Circuit has also recognized that "[i]n extraordinary cases . . . the district court may

downwardly depart when a number of factors that, when considered individually, would not

permit a downward departure, *combine* to create a situation that 'differs significantly from the

'heartland' cases covered by the guidelines.'" <u>United States v. Rioux</u>, 97 F.3d 648, 663 (2d

Cir. 1996) (quoting U.S.S.G. § 5K2.0, Commentary)(emphasis added).

      Other district courts have likewise found that separate personal circumstances, not

meriting a downward departure in isolation, can warrant a downward departure when

considered in combination. <u>See</u> <u>United States v. Mogel</u>, 956 F.2d 1555 (11th Cir. 1992) ("[A]

unique combination of factors may constitute the 'circumstance' that mitigates.") <u>Id.</u> at 1566,

citing <u>United States v. Cook</u>, 938 F.2d 149, 153 (9th Cir. 1991) ("factors specifically found by

the district court [may] converge to constitute a unique mitigating circumstance"). <u>Mogel</u> (above) at 1566, citing <u>United States v. Takai</u>, 930 F.2d 1427, 1434 (9th Cir. 1991) ("combination of two factors justifies departure"). <u>Mogel</u> (above) at 1566, citing <u>United States v. Pena</u>, 930 F.2d 1486, 1495 (9th Cir. 1991) (family ties and responsibilities, combined with aberrational conduct, justified departure from established Guideline range of 27-33 months to a five year term of probation); <u>United States v. Paradies</u>, 14 F. Supp. 2d 1315, 1320, 1322 (N.D. Georgia 1998) ("Courts may depart from the Guidelines based upon either an individual factor *or a number of factors combined*.") <u>Id.</u>, (emphasis added), citing <u>United States v. Rioux</u>, 97 F.3d 648, 662 (2d Cir. 1996)(citing 1995 U.S.S.G. §5K2.0 cmt.); <u>United States v. Collins</u>, 122 F.3d 1297, 1307 (10th Cir. 1997)(combination of health and age factors). <u>Id.</u> "The Guidelines . . . 'place essentially no limit on the number of potential factors that may warrant a departure.'" <u>Koon v. United States</u>, 518 U.S. 81, 106 (1996) (quoting <u>Burns v. United States</u>, 501 U.S. 129, 136-137 (1991)). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." <u>Koon</u> (above) at 113.

Mr. Funaro's exceptional family ties, circumstances, dedicated service to the community and health issues, combined with his highly likely future of compliance with laws

and overstatement of his Guidelines offense conduct are bases upon which this Court may and should rightfully depart. See United States v. Jagmohan, 909 F.2d 61 (2d Cir. 1990) (district court granted downward departure based on defendant's *solid employment record*, along with his naiveté displayed in committing the offense); United States v. Caruso, 814 F.Supp. 382 (S.D.N.Y. 1993) (defendant's age, military service, *medical problems*, *good employment record*, and *likely future compliance with law*, taken in combination justified downward departure).

The following factors in this case merit a downward departure: (1) Ed Funaro's exceptional and compelling family ties and personal circumstances; (2) Ed Funaro's charitable acts, good deeds and status as a community employer; (3) Ed Funaro's health concerns and (4) the overstated nature of the Guidelines' criminal offense conduct.

### 1.    The Defendant's Significant Family Ties and Personal Circumstances Merit a Downward Departure.

Ed Funaro has a very strong relationship with his family. The effect that any incarceration will have on him and his wife, children and family is a factor the Court may and should take into account in determining whether to depart from the Guidelines. Although family circumstances will not ordinarily support a downward departure, a district court may depart on such grounds in extraordinary cases. United States v. Allen, 87 F.3d 1224 (11th Cir. 1996). "[T]he Guidelines do not categorically prohibit a judge from departing on the

basis of offender-related characteristics, whether enumerated in the Guidelines or not." <u>United States v. Mogel</u>, 956 F. 2d 1555, 1561 (11th Cir. 1992). "Thus, district courts may depart on such grounds only in 'extraordinary' cases." <u>United States v. Allen</u>, 87 F.3d 1224, 1225 (11th Cir. 1996). <u>See also</u> <u>Koon v. United States</u>, 518 U.S. 81 (1996).

The Second Circuit has repeatedly recognized that the needs of family members are an established ground for a downward departure. <u>See</u> <u>e.g.</u>, <u>United States v. Galante</u>, 111 F.3d 1029 (2d Cir. 1997), <u>reh'g, en banc, denied</u>, 1997 U.S. App. LEXIS 30343 (2d Cir. 1997); <u>United States v. Johnson</u>, 964 F.2d 124, 129 (2d Cir. 1992); <u>United States v. Alba</u>, 933 F.2d 1117, 1122 (2nd Cir. 1991) (upholding a departure based on the existence of *family ties and obligations, recognizing effects of incarceration on defendant's children, parent*, and grandparent, where the court found a case of "a man who works hard to provide for his family" extraordinary) <u>Id.</u>; <u>United States v. Ayala</u>, 75 F. Supp. 2d 126 (1999) (drug defendant entitled to downward departure based on his *strong family ties,* the fact that one of his children was exceptionally dependent upon him, and despite this background, defendant has remained *committed to a nuclear family unit* and has *met all of his familial responsibilities . . .") <u>Id.</u>; <u>United States v. DeRiggi</u>, 893 F. Supp. 171, 182, 184 (E.D.N.Y. 1995), aff'd 72 F.3d 7 (2d Cir. 1995) (child with severe emotional distress requiring father's presence was ground for downward departure); ("[t]he desire not to inflict undue harm on innocent parties is a

universal sentencing consideration") Id.; see also United States v. Ramirez, 792 F.Supp. 922 (E.D.N.Y. 1992) (defendant's lack of guidance in combination with "strong efforts to lead a decent life in a poor environment," excellent employment history, and devotion to family justified downward departure); United States v. Hammond, 37 F.Supp.2d 204, 207 (E.D.N.Y. 1999) ("A sentence without a downward departure would contribute to the needless suffering of young, innocent children."); United States v. Rose, 885 F.Supp. 62 (E.D.N.Y. 1995) (purpose of departure is to protect innocent family members who need the defendant); United States v. Somerstein, 20 F.Supp.2d 454 (E.D.N.Y. 1998) (charitable contributions, community service, exceptional work habits, and experiences as child victim of Holocaust viewed together justified downward departure).

In Alba, supra, the defendant lived with his wife and their two daughters, ages four and eleven, and with his disabled father -- who depended on the defendant to help him get in and out of his wheelchair. The defendant worked two jobs to help his family. The Second Circuit approved of the district court's decision that this was a close-knit family whose stability depended on the defendant's continued presence, and that the defendant's incarceration in accordance with the Guidelines might result in the destruction of an otherwise strong family unit.

In Galante, supra, the defendant pled guilty to conspiracy to distribute and possess with intent to distribute heroin. The district court departed and sentenced the defendant to time served (8 days), five years supervised release with special conditions (including 24 months home detention), and 225 hours community service, based upon the defendant's family circumstances. The district judge found that if the father was imprisoned, the family would be destroyed, the mother and children would be on welfare, and there would be disastrous effects upon their education and upbringing. The appellate court noted that while the Guidelines prohibit considering socio-economic conditions in determining whether to downwardly depart (see U.S.S.G. § 5H1.10), that policy statement did not prohibit the district court from considering the economic dependency of a family on the defendant.

In Ayala, supra, the court granted an 8-level downward departure to a defendant convicted of racketeering and drug charges because of the defendant's roots from a poor drug infested neighborhood, the defendant's strong family ties and that fact that one of his children was exceptionally dependent upon him.

In the Johnson case, supra, the Second Circuit approved a 13-level departure for a defendant who was responsible for raising four young children, ranging in age from five months to six years.

These decisions are consistent with and faithful to the statutes implementing the Guidelines. Those statutes provide that the "court, in determining the particular sentence to be imposed, shall consider . . . the history and characteristics of the defendant." 18 U.S.C. § 3553(a). Ed Funaro's personal history is a circumstance "outside the heartland of the guidelines" and is a factor that strongly supports a downward departure of any sentence imposed by the Guidelines in this case.

Compelling reasons exist in this case for the Court to grant a downward departure based on Mr. Funaro's significant family ties and obligations. Like the defendants in Johnson, Alba, Galante and Ayala, Ed Funaro cares for three children who truly need him. See also United States v. Owens, 145 F.3d 923, 926 (7th Cir. 1998) (court granted downward departure where defendant took "an active role in raising his children and supporting his family"). Ed Funaro is married and has three children, Michael Funaro, age nineteen, Danielle Funaro, age seventeen, and Jason Funaro, age twelve (PSR at ¶ 50). Thanks in part to Ed Funaro's strong devotion to his children over the years, all the Funaro children are well adjusted, however they are still at important and influential times in each of their lives. Michael was a freshman at Penn State University until recently withdrawn due to a medical condition. Danielle was an honor student at Haddam-Killingworth High School and an All-State track athlete. Jason will be entering the eighth grade in the fall and actively participates

in a Boy Scout troop.  See letters from Jason, Danielle and Michael Funaro, attached hereto as Exhibit A.

The strong, cohesive nature of the Funaro family results in no small part to Ed Funaro's tireless devotion and active involvement in the lives of his family over the years.  Ed has coached baseball, basketball and soccer.  He has also actively participated in his sons' Cub Scout pack and Boy Scout troop, chaperoning numerous campouts, hikes and other events and organizing fundraisers.  Michael and Danielle have benefited from Ed's guidance and support over the years, and Ed's success in this regard is apparent.  Michael and Danielle, however, are now in their teenage years and are still at crucial and impressionable stages in their lives as they make important decisions about their studies and careers, and still stand to gain much from their father's experience and presence in their lives.  Jason, now age twelve, certainly has benefited from Ed's guidance, but stands to lose out on the many more years of his father's presence that Michael and Danielle enjoyed and benefited from so much.  Any sentence of incarceration for Mr. Funaro would indeed have serious and far-reaching consequences for the entire Funaro family.  See Ayala, DeRiggi, above.

In addition to needing his father's experience and guidance at this stage of his life, Michael Funaro also needs Ed's continued presence and support in dealing with his traumatic, life-threatening illness.  On February 7, 2005, Michael was diagnosed with having two brain

tumors.   On February 12th, invasive brain surgery was performed in order to biopsy the tumors.   Tests confirmed that the tumors were both malignant, and Michael was therefore immediately started on an aggressive, intensive brain radiation therapy course of treatment for seven weeks.   Michael completed his therapy on April 6th.   Ed's absence during Michael's time of need would have devastating effects on his recovery process and would significantly burden the Funaro family, who would be forced to care for Michael without Ed's assistance and support.

Ed's wife Lisa has recounted that:

her husband is a caring and honest individual who has spent his career helping people . . . he is a person to whom others depend on when in need.

(PSR at ¶ 52).   Many people have written letters[13] detailing Ed's devotion to his children's and their activities.   For example, Mrs. Barbara Brandolini writes that:

Ed Jr. has been a very active parent.   He is involved in the Boy Scouting program in Killingworth doing fundraising for the organization as well as involvement in camping and any other way that the organization may need him. He has coached baseball, basketball and soccer.   Ed . . . is a wonderful son and Father [sic] and an asset to the community.

(See letter of Mrs. Barbara Brandolini, Exhibit B).   Mr. James Goggins writes that:

---

[13]Over fifty people have written letters to the Court of support Mr. Funaro, his request for a downward departure and leniency in sentencing.   Where specifically quoted in this Memorandum in Aid of Sentencing, these letters are attached hereto and incorporated herein in Exhibit B.   The remaining letters are attached hereto and incorporated in Exhibit C.

Ed is a hard working husband and father who along with his wife Lisa, has raised three of the most thoughtful children you will ever meet.  Although he works over 60 hours a week, including nearly every Sunday, he finds time to volunteer to various organizations.  Whether it be leading a Boy Scout Troop [sic] activity or coaching the kid's [sic] soccer, baseball or basketball team, Ed gets involved.

(See letter of Mr. James Goggins, Exhibit B).

Mr. Robert DiBiccaro writes that:

It was while coaching second grade soccer with Ed that I saw first-hand how dedicated he is to his children . . . He was a very good teacher and showed much patience with the lesser skilled children.   At the games, he made good sportsmanship the highest priority, even in the wake of a disappointing call or a losing effort.  He set an excellent example for the boys in his interactions with the referees and other coaches . . . [I]t was very clear that his children and family were his highest priority . . . He demonstrated it in numerous ways – through his direct participation in his children's activities (Cub Scout and Boy Scout leader, and baseball, soccer and basketball coach), and by his attendance at his children's school functions, including track meets, golf tournaments, and music events.

(See letter of Mr. Robert DiBiccaro, Exhibit B).

Many other people have written letters on behalf of Mr. Funaro.  Ms. Sandra Miller writes that *"[Ed Funaro] is the type of person you would want to live in your neighborhood or working in your community.  An excellent roll [sic] model for any man, woman or child . . . a decent young man."* (See letter of Ms. Sandra Miller, Exhibit B)(emphasis added).  Fred and Eunice Mayo write that *"Ed Funaro is a fine father, son and business man, a needed asset to the area and social involvement."* (See letter of Ms. Sandra Miller, Exhibit B)(emphasis

added).  Mr. Louis J. Imperato, Jr. writes that *"[Ed Funaro] is an excellent family man who does an excellent job raising and caring for his family.  He is always involved with them, taking them to sporting events or coaching their teams . . . I have the utmost respect and esteem for him and his entire family."* (See letter of Mr. Louis J. Imperato, Jr, Exhibit B) (emphasis added).

The letters submitted by these individuals provide a background into Ed Funaro's character and his tireless efforts to raise his family in a positive, community-oriented environment.  Mr. Funaro's absence from his family and his community, however, is likely to have serious and far-reaching effects on the hard work accomplished to date.  **Lisa Funaro reports that it is very difficult to comprehend the family's current circumstances. (PSR at ¶ 52).  As a result of the current legal difficulties the family is experiencing, she has returned to work full-time as a financial analyst and is no longer home to care for the children. (PSR at ¶ 54).  She is unsure of how she will handle the family responsibilities if Mr. Funaro is incarcerated**. (PSR at ¶ 54)(emphasis added).

Lisa Funaro fears the effect that any absence due to Ed's incarceration will have on the family, especially Jason, their youngest son. (PSR at ¶ 53).  She does not believe that it is fair that Jason will be deprived of his father's love and attention, that was so dearly enjoyed by their two older children. (PSR at ¶ 53).  Without the benefit of his father's guidance and

support, Jason Funaro will be deprived of an important aspect of his youth.  See Ayala, above at 139.

Throughout his life, Ed Funaro has made remarkable efforts to establish undeniably concrete family ties and values.  Given the extremely traumatic and detrimental effect that a term of confinement would have upon Mr. Funaro's wife and children, Mr. Funaro respectfully requests that the Court grant his prayer for leniency in its determination of an appropriate sentence.  Johnson, Alba, Galante and Ayala, supra, above  See personal letters (Exhibits B and C).

**2.    The Effect That Any Term Of Incarceration Will Have On The Defendant's Family, His Business and the Killingworth and the New Haven Community Merits A Downward Departure**

The Defendant's charitable acts, deeds and status as a community employer merit a downward departure.    Many people have written letters detailing Ed's community involvement and charitable acts in Killingworth, and by extension, beyond his nuclear family to the entire Killingworth community.  Those letters are contained in Exhibits B and C, attached hereto, and are incorporated herein.  Likewise, we incorporate by reference the argument described in Section 1 above relating to family ties, which overlaps in combination with Mr. Funaro's community ties.