Any term of incarceration will have serious and far reaching consequences on the extended Funaro family as well as the entire Dixwell Avenue – Newhallville New Haven community where the defendant has served the needs of the low-income, minority community for decades and provided an unquestionable benchmark of public service for the community in which he lives and works. The impact that a prison sentence for Ed Funaro will have on his parents, their ability to continue the family business and the consequences for the greater New Haven community are all grounds upon which the Court may and should depart downward. United States v. Johnson, 964 F.2d 124, 129 (2d Cir. 1992); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991) (upholding a departure based on the existence of *family* ties and *obligations*, recognizing *effects of incarceration on defendant's* children, *parent*, and grandparent); the Second Circuit has also recognized that "[i]n extraordinary cases . . . the district court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that 'differs significantly from the 'heartland' cases covered by the guidelines.'" United States v. Rioux, 97 F.3d 648, 663 (2d Cir. 1996) (quoting U.S.S.G. § 5K2.0, Commentary).

Edmund Funaro is a loving son, husband and father. His parents, Edmund Sr., now age 70 (PSR at ¶ 48) and his mother, Janet Funaro, now age 67 (PSR at ¶ 48), rely on him to help run the family business, Visel's Pharmacy, located on Dixwell Avenue in New Haven.

Visel's Pharmacy has been in operation since 1912. (PSR at ¶ 63). It has been owned and operated by the Funaro family since 1964. (PSR at ¶ 48). Edmund Sr., also a registered pharmacist, ran the pharmacy operations exclusively until 1983 when Ed graduated from pharmacy school and received his license from the Connecticut Commission on Pharmacy to practice pharmacy in the State of Connecticut. (PSR at ¶ 5).

Since its inception, Visel's Pharmacy has served the needs of the Dixwell Avenue community in New Haven. (PSR at ¶ 63). Over the years, the neighborhood surrounding Visel's has changed dramatically. The pharmacy now provides many services to the low-income, minority population. (PSR at ¶ 63) Many customers do not have their own transportation and rely on the close proximity of the pharmacy to their homes for basic needs, including purchasing food (PSR at ¶ 63) and other convenience-type items, buying money orders, paying bills, using the services of Notary Public. In addition, the pharmacy provides a delivery service to people who are shut in. (PSR at ¶ 63).

The impact that Visel's Pharmacy has had on the Dixwell Avenue community over the years is clearly evident. Many people have written letters on Mr. Funaro's behalf, attesting to how important Visel's Pharmacy is to the neighborhood. Connecticut State Representative William R. Dyson has indicated that:

> Edmund Funaro Jr.'s family has owned and operated Visel's Pharmacy on
> Dixwell Avenue in New Haven since the 1960's . . . As business owners

within a lower socio-economic community, it is evident that they feel a moral responsibility to provide in ways that reflect their awareness of this status. Put simply, if a customer has needs, the Funaros' first and foremost concern is the taking care of these needs. Financial concerns are always on the minds of business owners, but by all appearances the Funaros seem as intent on furthering their customer's benefit, as they do with their own. It is this mindset and the many resulting actions that indeed make Visel's a valuable member of our community . . . That Visel's is able to exist, no less provide the same quality of customer service since its inception, is indeed quite remarkable. It distresses me to think of our community without Visel's Pharmacy. If Edmund Funaro is mandated to a prison sentence, I fear that this absence will inevitably occur. If that happens, it will not only be Edmund Funaro, Jr. that suffers, it will be his pharmacy, his family and our community as well.

See Exhibit B, Letter of Connecticut State Representative William R. Dyson.

The Reverend Scott Marks of the Connecticut Center for a New Economy writes that:

" . . . Visel's Pharmacy and its owners . . . have both been a tower of strength in the Dixwell/Newhallville Community. They have serviced a community that many have unfortunately turned their backs on and may have not otherwise found fit to bring a necessary service to. Over the past years the owners of Visel's Pharmacy have committed their time and resources to various community and citywide initiatives."

See Exhibit B, Letter of Reverend Scott Marks.

Mr. Stephen Marcarelli, CPA of Finer, Chasse & Marcarelli, L.L.C. writes that "[t]he Pharmacy is located in the upper Dixwell Avenue section of New Haven. It's an area of the city that no national pharmacy chain would ever consider locating to." See Exhibit B, Letter of Mr. Stephen Marcarelli, CPA. Michael Shea of Hamden writes that:

[t]he drug store is the only place still operating from downtown New Haven to the bank area of Hamden. The low income familys [sic] depend on store [sic] for banking, food, bill paying, [and] medical help . . . The store has been robed [sic] at gun point, broken in to [sic] . . . still they stay, employing many kids who would never get jobs other wise [sic] . . . now **the store is an oasis in a desert of poverty**. Without Ed Jr. it is possible the store would close as Ed Sr. is older and not many people are willing to work inner city shops. See Exhibit B, Letter of Michael Shea.

Paul and Nora Sandor of Cheshire write that:

"[t]he business which Mr. Funaro has helped build provides health care services to the poor urban Dixwell Avenue community and there-by serves many who are less fortunate. It is the only pharmacy business to serve the area in which it is located and serves many who do not have means of private transportation. Visel's has also provided employment opportunities for those in the poor New Haven community which it serves . . . Mr. Funaro is an integral part of Visel's being able to provide significant benefits to the community [Edmund Funaro Jr.'s] devotion to the community has continued even though he has faced death threatening armed robbery risks in the past. Penalizing Mr. Funaro will have a direct impact on the ability of Visel's to continue to provide this assistance to the community. Visel's cannot continue without his presence as a licensed pharmacist. No other pharmacy serves those who are less fortunate and his aging father cannot sustain the business without the help of this son as a licensed pharmacist. **The destruction of Visel's as a business will have a significant impact on many others within the community**. (Emphasis added)

See Exhibit B, Letter of Paul and Nora Sandor.

Ms. Karen Hekeler of Cheshire writes that "[w]hen the neighborhood that they service began to deteriorate, and robberies and break-ins were a daily event for other merchants in the area, the family could have chosen to move their business to a safer location. Ed would not even consider it. He believed that after 40 years, the store was part of the community it

served.  That's [sic] it's [sic] people came to depend on them and the services they provided."
<u>See</u> Exhibit B, Letter of Ms. Karen Hekeler, <u>see also</u> Letter of Anthony J. Malafronte, RPh.

Since 1983, Ed Funaro has assisted his father with the day-to-day operation of the store on a full time basis.  At age 70, Edmund Funaro, Sr. is rapidly approaching a point where he will be physically unable to continue to operate Visel's Pharmacy and provide those basic services that the store has offered to the community for decades.  Without Ed Funaro Jr. to help run the family business, both at the retail and pharmacy level, the very real danger exists that Visel's Pharmacy will be forced to close, leaving a void in so many important areas for the entire Dixwell Avenue community.

Visels presently employs nineteen employees, both full-time and part-time, who depend on their employment to provide for their families.  As previously explained, the employee roster includes Ed Funaro, Sr., and Janet Funaro, who are both at the age of retirement and unable to continue working full-time.  Though he surrendered his pharmacy license, Ed, Jr. remains an integral part of the family business.  Without his pharmacy knowledge, business acumen and computer skills, Visels would cease to operate, having a severe impact on the community as well as the families of the employees.  Over the past 20 ½ months since Ed's conviction, Visels has only been able to continue its operations due to Ed, Jr.'s continued role in the business aspects of the pharmacy as well as Ed, Sr.'s working extra

hours without full compensation. The Funaro family, as well as many members of the community, fear what will happen to this neighborhood if Visels, an "oasis in a desert of poverty," closes its doors forever. See Exhibit B, Letter of Michael Shea.

While a defendant's good works are not normally a ground for a downward departure, "when presented with an atypical case, a court may consider whether a departure from the guidelines is warranted." Koon v. United States, 518 U.S. 81 (1996). A case is atypical when "there are circumstances of a kind or degree not adequately taken into consideration by the Commission." Id., citing 1995 U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b); see also United States v. Delvecchio, 920 F.2d 810, 813 (11th Cir. 1991), United States v. Paradies, et al, 14 F. Supp. 2d 1315 (N.D. Georgia). "Courts may depart from the Guidelines based upon either an individual factor or a number of factors combined." Paradies (above) at 1320, citing United States v. Rioux, 97 F.3d 648, 662 (2d Cir. 1996). The letters written on Ed Funaro's behalf indicate that his charitable and other good works are an exception to the norm, an example of a circumstance of a kind or degree not adequately taken into consideration by the Commission, and a basis upon which the Court can and should depart downward in this case. Rioux, Koon, Paradies, supra, above. Recall the letters written by Mrs. Barbara Brandolini, Mr. James Goggins and Mr. Robert DiBiccaro, attached hereto in Exhibit B, explaining Ed's commitment to his community by volunteering his time to participate in the local Boy Scouts

chapter and by coaching baseball, basketball and soccer.  <u>See also</u> letter from Edmund Funaro, attached hereto as Exhibit D.

In <u>Paradies</u>, the Court granted a downward departure where the defendant's participation in *community charitable activities and causes*, <u>in combination with other factors</u>, such as military service, physical and mental health and age, presented a situation not adequately considered by the Sentencing Commission when formulating the Guidelines. <u>Paradies</u>, at 1322 (emphasis added).  District courts in other circuits have found downward departures to be warranted in similar cases.  <u>See also</u> <u>United States v. Woods</u>, 159 F. 3d 1132 (8th Cir. 1998) (District court did not abuse its discretion when it granted one level downward departure, finding that defendant's case fell outside the "heartland" of cases due to exceptional charitable conduct in bringing two troubled young women into her home, caring for them and seeing to their education, and exceptional assistance to an elderly friend, enabling him to live out his remaining years with greater independence.); <u>United States v. Rioux</u>, 97 F.3d 648, 663 (2d Cir. 1996) ("It was not an abuse of discretion for the district court to conclude that, in combination, [the defendant's] medical condition and charitable and civic good deeds warranted a downward departure.")

### 3.  The Defendant's Health Concerns Merit A Downward Departure

A defendant's medical problems are a basis upon which a court may depart downward from the Sentencing Guidelines.  United States v. Caruso, 814 F.Supp. 382 (S.D.N.Y. 1993) (defendant's age, military service, *medical problems*, *good employment record*, and likely future compliance with law, taken in combination justified downward departure); United States v. Collins, 122 F.3d 1297, 1307 (10th Cir. 1997) (upholding downward departure based on combination of factors including high blood pressure, ulcers, arthritis and prostatitis); United States v. Rioux, 97 F.3d 648 (2d Cir. 1996)(upholding downward departure based on a combination of factors, including kidney disease, bone disease and charitable acts).

The defendant recognizes that health concerns do not ordinarily provide support for a downward departure. See generally United States v. Paradies, 14 F. Supp. 2d 1315, 1320 (N.D. Georgia 1998) ("[t]he Guidelines state that a downward departure based on poor physical condition may be appropriate only when a defendant has 'an extraordinary physical impairment.")  However, the defendant asserts that there are extraordinary circumstances present in this case that take his medical condition out of the 'heartland' of typical cases described by each of the Guidelines.

Edmund Funaro, Jr. has had several surgeries that have impacted his general health condition.  In 1991, he underwent surgery for ulcerative colitis, where he underwent a total

colectomy and removal of his small intestine, leaving him with a permanent ileostomy[14], requiring Mr. Funaro's intestinal waste to drain through an opening in his abdominal wall into a stoma bag. (PSR at ¶ 55, 56). See also Exhibit E, Letter of Dr. Frank, J. Troncale, M.D.). "Since the surgery [Mr. Funaro] has been able to maintain his health by meticulous attention to his diet . . . and with careful attention to the skin around the abdominal stoma[15] . . . [which] requires special adhesives and skin protectants." (See Exhibit E, Letter of Dr. Frank, J. Troncale, M.D.).   Because of Mr. Funaro's special medical condition, Dr. Troncale has indicated that Mr. Funaro has "special needs", id., and "may not fare well in prison, not only because it is unlikely that he will have access to the special diet that he follows, but also because of the need for a reliable supply of stoma care paraphernalia." Id.  According to Dr. Troncale, these deficiencies "could adversely affect [Mr. Funaro's] physical and emotional health, and should be given compassionate consideration in any sentencing deliberations." Id. Mr. Funaro also had surgery in 1999 to repair a perestomal hernia.[16]  Mr. Funaro's course of

---

[14] An ileostomy is a surgically created opening or stoma in the ileum or the lowest portion of the small intestine, allowing bodily waste to exit through the abdominal wall into a stoma bag or pouch.  See Ileostomy Reference Guide, Exhibit F.

[15] A stoma is the general term for the opening in the abdominal wall through which the intestines or bowels empty bodily waste after a surgical procedure to correct inflammatory bowel disease.

[16]The PSR combines both these surgeries into one procedure, PSR at ¶ 56, however, they are two separate events for two different conditions.

recovery "has been complicated by ankylosing spondylitis[17] and sacroiliitus, requiring medication." (See Exhibit E, letter of Serle M. Epstein, M.D.).

In <u>United States v. Paradies</u>, 14 F. Supp. 2d 1315 (N.D. Georgia 1998)[18], the sentencing court denied defendant's request for a downward departure on the basis of poor mental and physical health because it did not find the Defendant's mental state, when considered alone, to be sufficiently severe as to provide a basis for downward departure. However, on defendant's motion for re-sentencing, the court found that "[t]he *combination of ailments* . . . presents a situation not adequately considered by the Sentencing Commission when formulating the Guidelines." <u>Id.</u> (emphasis added), citing <u>United States v. Collins</u>, 122 F.3d 1297, 1307 (10th Cir. 1997) (upholding downward departure based on combination of factors including high blood pressure, ulcers, arthritis and prostatitis); <u>United States v. Rioux</u>, 97 F.3d 648 (2d Cir. 1996)(upholding downward departure based on a combination of factors, including kidney disease, bone disease and charitable acts).

In <u>Rioux</u>, 97 F.3d 648 (2nd Cir. 1996) the defendant, the former High Sheriff of Hartford County, was convicted of a fraudulent scheme to commit extortion and for extorting

---

[17] "Ankylosing spondylitis is a form of arthritis that is long-lasting (chronic) and most often affects the spine. It can cause pain, stiffness, with swelling and limited motion in the low back, middle back, neck and hips. Fatigue is common." *WEB*MD Health (See Exhibit F, attached)

funds from appointees to positions in his department.  At sentencing, the court reduced the defendant's base offense level from 20 to 10 because of his physical condition, which required regular doses of medication, and his charitable fundraising efforts and civic accomplishments, sentencing him to three years' probation, six months of home confinement, 500 hours of community service and a special assessment.

The sentencing court found that Rioux's case differed significantly from the heartland of Guideline cases in that he had kidney problems, a kidney transplant over 20 years previously, and that his new kidney was diseased.  The court further found that as a result of his kidney problems, Rioux contracted bone problems requiring a double hip replacement and medical monitoring of his condition.  Additionally, the court also found that Rioux "unquestionably has participated to a large degree in legitimate fund raising efforts.  In particular, the Court noted Rioux's efforts to raise money for the Kidney Foundation.  On appeal by both parties, the Second Circuit affirmed in all respects, indicating "[I]t was not an abuse of discretion for the district court to conclude that, in combination, Rioux's medical condition and charitable and civic good deeds warranted a downward departure." Id. at 663.

---

[18] This case is captioned "United States v. Ira Jackson, Mack Wilbourn aka McKinley Wilbourn, Daniel M. Paradies, The Paradies Shops, Inc., and Paradies Midfield Corporation", but was before the court on Defendant, Daniel M. Paradies' motion for re-sentencing.

Mr. Funaro's physical health and well being since his operations in 1991 and 1999 have resulted from very careful attention to his medical problems and the instructions from his doctor, requiring strict compliance with dietary guidelines and physical care of his stoma. Pursuant to 18 U.S.C. §3553, factors that are to be considered in sentencing include the need for the sentence "to provide the defendant with needed . . . medical care, or other correctional treatment in the most effective manner." 18 U.S.C. §3553 (a)(2)(D).  Due to the obvious restrictions placed upon him by any period of incarceration, Mr. Funaro will not only experience difficulty in maintaining the same level of conscientious attention to his medical conditions that he requires, but will likely suffer physically and emotionally.  As such, "the most effective manner" for Mr. Funaro to treat his medical conditions is through the same level of meticulous diet and care that he has for years from the privacy of his home.[19]

### 4.    The Sentencing Guidelines Overstate the Defendant's Offense Conduct.

Ed Funaro's conduct, lack of any previous criminal history and background do not fairly reflect a potential sentence of confinement as delineated by the Guidelines, and the defendant respectfully asks the Court to exercise its discretion to depart from the offense levels of the Guidelines.  The Second Circuit has given discretion to district judges to determine whether the Guidelines' rigid, mathematical calculation is consistent with whether

---

[19] See footnote 1 above regarding FMC Devens, MA.

the Guidelines adequately represent the seriousness of the offender's offense conduct and criminal history:

> [A] sentencing judge should exercise discretion whenever the judge concludes that the consequences of the mathematical prior-history calculation, prescribed by sections 4A1.1 and 4A1.2, either under represent or over represent the seriousness of a defendant's prior record. We also agree that in the case of a defendant whose offense level is raised by his criminal history into career offender status, such discretion may be exercised, to the extent thought appropriate, to reduce either the criminal history category or the offense level, or both.

United States v. Rivers, 50 F.3d 1126, 1131 (2d Cir. 1995)(Guidelines overstated defendant's criminal history, justifying horizontal departure) Id. In addition, aside from the enhancing effect that a criminal history may have on a defendant's offense level, the Second Circuit recognizes that the Sentencing Commission has not adequately considered certain factors in creating its rigid drug-quantity table, which can operate to overstate a defendant's culpability. United States v. Lara, 47 F.3d 60, 66-67 (2d Cir.1995).

In United States v. Lara, the district court found that the Sentencing Commission had not adequately considered "the relationship between the amount of narcotics distributed by a defendant and the length of time it took the defendant to accomplish the distribution." Id. at 63 (internal citations omitted). The district court noted that:

> Congress authorized severe sentences for those dealing in large quantities of narcotics in order to provide justified punishments for 'stereotypical drug dealer[s],' those described in congressional debates as the ones who 'live in the

fast lane…drive big cars—usually several—like BMWs and Mercedeses…[and] like …[b]ig gold chains and big gold [and]diamond rings.'

Id. (internal citations omitted).  The district court also noted that "those who deal in kilogram quantities of narcotics are more culpable than the street peddler who sells $10 bags," yet, "under the Guidelines, a dealer caught selling a kilogram of cocaine on a single occasion would receive the same sentence as a street vendor who admitted to an undercover agent that he had told 25 grams of cocaine a day while working on the same street for about seven weeks." Id.

Ed Funaro is not a "stereotypical drug dealer"; he is neither a king-pin, nor a street peddler.  At the time of the charged offenses, Ed Funaro was a pharmacist, distributing legal medications to needy patients.  However, under the Guidelines calculations, for the period of March 1, 1998 through June 5, 2000, Ed Funaro distributed medications equivalent to 115.23 kilograms of marijuana.  (U.S.S.G. 2D1.1(a)(3); PSR at ¶ 32).  The use of the aggregate quantities of legal narcotics distributed by Ed over a two year time period as a basis for determining Ed's offense level overstates his culpability.

The district court in United States v. Williams, 78 F.Supp.2d 189 (S.D.N.Y. 1999), was confronted with a defendant whose criminal history was much worse than that of Ed Funaro.  There, the court was presented with a young man adjudged a juvenile delinquent at age fifteen.  At age nineteen, he was convicted of an attempted sale of two glassine envelopes

of heroin to an undercover officer. Nine months later, he was convicted of selling one $10 bag of crack cocaine to an undercover officer. At age twenty-one, he had his third state drug conviction for selling crack on the street, and was found to have sixty-one crack vials in his possession.

The court carefully examined the application of the Sentencing Guidelines and the goals of Congress and the Commission in adopting the Guidelines. It "determined that 'the sentencing range specified by the career offender guideline . . . overstate[d] the seriousness of the defendant's prior offenses'" and therefore agreed to hear argument on "how far it should 'reduce either the criminal history category, the offense level, or both.'" Id. at 194 (quoting Rivers, 50 F.3d at 1130, 1331).

Similarly, in United States v. McFarland, 1992 U.S. Dist. LEXIS 19038 (S.D.N.Y. 1992), aff'd, 996 F.2d 302 (2d Cir. 1993), the defendant was found guilty of possession with intent to distribute 56.79 grams of crack cocaine and 6.3 grams of cocaine. He had two prior convictions of sales of controlled substances, one of a vial of crack cocaine and the other of seven vials of crack, both sales occurring approximately three years earlier when the defendant was age 18. This court likewise departed from the career offender Guideline, finding "downward departure is appropriate . . . on the grounds that the guidelines otherwise

would result in the imposition of a sentence which would over represent the defendant's past criminal history." Id. at *4.

In United States v. Ramirez, 792 F.Supp. 922 (E.D.N.Y. 1992), the court was confronted with an eighteen year-old young man that had imported drugs into United States from Columbia for a $2,000 courier fee because he was impressed by older men with money and clothes.   In departing to a sentence of probation and community service, the court observed that the defendant's lack of guidance in combination with his "strong efforts to lead a decent life in a poor environment," *excellent employment history, and devotion to family justified downward departure.* "The criminal act was an aberrant one for the defendant.  The defendant 'stumbled into something, awkwardly [and] naively.'" Id. at 923 (quoting United States v. Takai, 941 F.2d 738, 743 (9th Cir. 1991); United States v. Pena, 930 F.2d 1486, 1494 (10th Cir. 1991)) (emphasis added);    see also Zecevic v. United States Parole Commission, 163 F.3d 731, 736 (1998) (The court believed that a departure was appropriate because "a term of imprisonment would interrupt defendant's efforts at rehabilitation through education while living with . . . an appropriate role model.  A sentence of probation -- itself a serious punishment -- must be imposed.").

Ed Funaro's conduct, criminal history and background do not fairly reflect a potential sentence of confinement as delineated by the Guidelines.  As previously noted, this case does

not involve a drug distribution scheme typically seen in criminal drug cases. It does not involve drugs that are illicit *per se*, such as cocaine or heroin. Rather, the substances involved were medications, lawful *per se* when used in the usual course of a professional medical practice. Further, Ed Funaro was a Registered Pharmacist and was properly licensed to possess and dispense the controlled substances at issue in this case pursuant to lawful prescriptions, the determination of which was the subject of a nearly three week debate during the trial and four days of jury deliberation. Equating a pharmacist's handling and dispensing of controlled substances, in the quantities and at the offense levels contemplated in this case by the Guidelines, grossly overstates Ed Funaro's offense conduct. As such, the defendant respectfully requests that the Court exercise its discretion and depart downward from the Guidelines offense levels pursuant to Rivers, 50 F.3d at 1126, 1131, supra.

### B. Based on an Analysis of the Factors Set Forth in 18 U.S.C. §3553(a)

The United States Supreme Court and Second Circuit have directed the district courts to utilize the factors set forth in 18 U.S.C. §3553(a), in addition to the Guidelines, in deciding reasonable sentences for the defendants before them. Booker, supra, at *75; United States v. Crosby, 2005 U.S. App. LEXIS 1699 (2d Cir. Feb. 2, 2005). These factors include the nature and circumstances of the offense and history and characteristics of the defendant, the need for the sentence, the kinds of sentences available, any pertinent policy issues, the need to avoid

sentencing disparities among similar defendants and the need to provide restitution to any victims of the offense. 18 U.S.C. §3553(a). Below is an analysis of these statutory factors as they pertain to Ed Funaro. Where appropriate, in an effort to avoid repetition, the below analysis will incorporate by reference arguments made above in support of downward departures.

### 1. Nature and Circumstances of the Offense

As detailed above in this memorandum, Mr. Funaro was found guilty by jury verdict of 27 counts of Illegal Dispensation of Controlled Substances in violation of 21 U.S.C. §841(a)(1) and (b)(1)(C). The charges against Mr. Funaro stemmed from an investigation by the DEA and Drug Control into the prescribing practices of Dr. Massie. A warrant was executed for Visel's in conjunction with the investigation against Dr. Massie since Visel's was located in the same neighborhood as Dr. Massie's office. After digesting the evidence obtained at Visel's, the law enforcement officials decided Mr. Funaro was also a target in the investigation along with several other area pharmacists. During the investigation of Dr. Massie, however, the authorities never advised Mr. Funaro that Massie's license to prescribe controlled substances had expired. Furthermore, the drugs at issue in this case were not illicit *per se*. Rather, the substances involved were medications, lawful *per se* when used in the usual course of a professional medical practice.

### 2. History and Characteristics of the Defendant

Though portions of the Guidelines specifically discourage or outright prohibit consideration of the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1) expressly requires their consideration. In determining a reasonable sentence, whether or not within the Guideline range, the Court may now consider such characteristics as the age of the defendant, his education and vocational skills, his physical condition, his employment record, his family ties and responsibilities as well as his civic and charitable contributions. United States v. Ranum, 353 F.Supp.2d 984, 986 (E.D.Wis. 2005). "Thus, in cases in which a defendant's history and character are positive, consideration of all of the §3553(a) factors might call for a sentence outside the guideline range." Id.

In light of this new mandate to consider the history and characteristics of the defendant, this portion of the memorandum will summarize the relevant history and characteristics of the defendant which are fully detailed above. Mr. Funaro is forty-five years old. Besides this case, Mr. Funaro has no criminal history whatsoever. He earned a Bachelor of Science degree in Pharmacy at the University of Connecticut, and has worked as a pharmacist in his family's business since 1983 and until the guilty verdict in this case. He is married and has three children. Mr. Funaro has been heavily involved in his children's activities throughout the community, coaching basketball, baseball, soccer, and assisting with

his son's boy scout troop.  As important, Mr. Funaro and his family's business have served as

a safe haven for the low-income population of New Haven.  As detailed above, Visel's serves

the basic needs of the community, including providing prescriptions and groceries on credit

for those customers experiencing financial difficulties as well as delivering prescriptions to

customers who lack transportation.   Without Mr. Funaro's continued involvement in the

family business, Visel's may have to close its doors to its community forever, leaving

employees out of a job and an entire community abandoned.

Amazingly, Mr. Funaro has been able to carry on his family business and remain

actively involved in his children's activities despite his serious health problems.  He has

suffered through two surgeries, and has been left with permanent conditions, which require

constant care and attention.

> Although the Guidelines do not ordinarily account for a defendant's health
> problems, absent an "extraordinary physical impairment," U.S.S.G. §5H1.4,
> post-Booker I may consider that [defendant's] health is substantially more
> impaired than most defendants'.  This both renders [him] a greater burden on the
> federal prison system, and incarceration a greater burden on [him].

Simon v. United States, 361 F.Supp.2d 35, 42 (E.D.N.Y. 2005) (Sifton, J.).

Combined, these characteristics paint a picture of a family man, devoted to serving his

community, despite his physical impairments.  He is no threat to the public, nor likely to have

future criminal involvement.   A sentence of supervised release would be reasonable and sufficient under the circumstances of this case and this defendant.

### 3.  Need for the Sentence

The need for the sentence imposed is determined by the seriousness of the offense, promotion of respect for the law, the need for a just punishment, the need for deterrence and the needs of the defendant.  18 U.S.C. §3553(a)(2).  Mr. Funaro need not be punished with a severe sentence in order to comply with the requirements of 18 U.S.C. §3553(a)(2).  The controlled substances involved in this case consisted of prescribed medications, rather than cocaine, heroin and the like, reflecting a diminished level of seriousness compared to the typical illegal distribution cases.  Furthermore, there is no danger in this case that Mr. Funaro will commit a crime in the future; he has been crime-free for over five (5) years since the offense concluded.   He is of no harm to his community and poses no threat, facts acknowledged by the United States Probation Office in modifying Mr. Funaro's reporting requirements.  See letter from U.S. Probation Officer Wilfredo Duran, attached hereto as Exhibit G.  In fact, as evidenced by the numerous letters attached in Exhibits B and C, he is beloved by his community.  In addition, the defendant requests that the Court take his health problems and the letters from his doctors into consideration and determine that incarceration is unnecessary in this case.  Even upon sentencing Mr. Funaro to a term of probation or

supervised release (including home confinement), most persons in similar circumstances would surely view the consequences to the defendant as very serious.

### 4. Kinds of Sentences Available, Need to Avoid Sentencing Disparities and Need to Provide Restitution

The Guideline range was calculated in the PSR at 78 to 97 months. Under the circumstances of this case, however, the range should not be entitled to significant weight. Most importantly, it should not be considered to be the "starting point" for considering the other §3553(a) factors.

In United States v. Ranum, supra, at 986, Judge Adelman concluded that the Guidelines are not presumptive, but are truly advisory, and should be treated as one factor to be considered in conjunction with other factors that Congress enumerated in §3553(a). Judge Pratt followed Ranum, in United States v. Myers, 353 F.Supp.2d 1026, 1029-30 (S.D. Iowa 2005):

> At first blush, a system of discretionary sentencing would appear to invite what Congress hoped to avoid, unfairness at sentencing. The Supreme Court in Booker, however, reminded judges and the public that true uniformity exists not in a one-size-fits-all scheme, but in "similar relationships between sentence and real conduct." 125 S.Ct. 738, at 21. This is the guiding principle at work in Booker. This Court will endeavor, then, to square real conduct presented by the evidence presented concerning a particular defendant, with the public interests expressed through the sentencing statute, in order to deliver a judgment in a manner as even-handed and reasonable as humanly possible.
>
> Id.

Furthermore, even under the Guidelines, Mr. Funaro could receive relief from the applicable Guideline range under U.S.S.G. §5H if there are circumstances present that are of a kind or to a degree not adequately taken into consideration by the Sentencing Commission. In other words, in extraordinary circumstances such as Mr. Funaro's personal circumstances and family ties, his charitable acts within his community and his medical condition, the Court could depart from the Guideline range and award a more lenient sentence. Any disparity between the sentence imposed in this case and the sentences in similar cases could be explained by the particular facts of this case and Mr. Funaro's unique personal circumstances.[20] Furthermore, restitution is not an issue in this case.

In "considering" the Guideline range along with all of the other factors in this case, Mr. Funaro submits that a sentence of supervised release would be appropriate under the totality of circumstances.

### 5. Policy Issues

The Guidelines are founded on a number of policy considerations. According to U.S.S.G §5H, certain defendant characteristics are not ordinarily relevant in considering

---

[20] On the issue of sentencing disparity, as the Court is aware, the other pharmacist-defendants in this case were all sentenced to some form of probation and/or home confinement. Though the other pharmacists did not put the Government to its proof, Mr. Funaro believes that his personal circumstances, as outlined in detailed throughout this memorandum, warrant a similar sentence.

whether a downward departure is warranted. For those characteristics to warrant a departure under the Guidelines, they must be present to an extraordinary degree. Despite these warnings from the Guidelines, however, 18 U.S.C. §3553(a) now requires a review of the defendant's history and characteristics in deciding a reasonable sentence. In addition, the policy behind 18 U.S.C. §3553(a) is to provide "a sentence sufficient, but not greater than necessary, to comply with the purposes set forth paragraph 2," that is to reflect the seriousness of the offense, promote respect for the law, provide a just punishment and provide for deterrence and the needs

of the defendant. As set forth above in section 3, a sentence of supervised release would be reasonable and sufficient to comply with the policy requirements of 18 U.S.C. §3553(a).

## IV.    Conclusion.

For all the above reasons, Edmund Funaro requests that the Court impose a sentence of probation and/or supervised release (including home confinement) in this case. Alternatively, the defendant requests that if any incarceration is imposed, that the Court recommend that the Bureau of Prison place Mr. Funaro in the FMC, Deven, MA to accommodate his medical needs and family concerns.

Respectfully Submitted,
Defendant Edmund Funaro, Jr.

By: _____
Alan J. Sobol
Fed. Bar No. CT00955
**O'CONNELL, FLAHERTY & ATTMORE, LLC**
280 Trumbull Street, 23rd Floor
Hartford, CT 06103-3598
Telephone:  (860) 548-1300
Facsimile:  (860) 548-0023

## **CERTIFICATE OF SERVICE**

This is to certify that the foregoing Memorandum in Aid of Sentencing was hand-delivered to the following parties and counsel of record this 25th day of July, 2005 as follows:

Jonathan Biran, Esq.
Assistant United States Attorney
Federal Building and U.S. Courthouse
United States Attorney's Office
157 Church Street, 23rd Floor
New Haven, CT 06501

Jacqueline Carroll, USPO
United States Probation Office
Federal Building & U.S. Courthouse
157 Church Street, 22nd Floor
New Haven, CT 06510

_____
Alan J. Sobol

50