UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NUMBER: 3:01CR17 (CFD) |
| | : | |
| v. | : | August 1, 2005 |
| | : | |
| EDMUND FUNARO, JR. | : | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MEMORANDUM IN AID OF SENTENCING

### Introduction

Defendant Edmund Funaro, Jr. ("Funaro") has requested a downward departure from the

applicable Guidelines Sentencing Range of 78-97 months of incarceration and/or a non-

Guidelines sentence under United States v. Booker, ___ U.S. ___, 125 S. Ct. 738 (2005). See

Defendant's Memorandum in Aid of Sentencing (hereinafter, "Memorandum").[1]  Funaro raises

four arguments for such a departure or non-Guidelines sentence: (1) exceptional family ties and

personal circumstances; (2) charitable acts and community service; (3) health problems; and (4)

his claim that the Sentencing Guidelines range overstates the seriousness of the offense.  The

Government respectfully submits that these arguments neither individually nor collectively

warrant a downward departure or a non-Guidelines sentence.

---

[1]     Funaro does not take issue with the Probation Office's calculation of the Guidelines
Sentencing Range of 78-97 months' imprisonment.

<u>Discussion</u>

I.      <u>Guidelines Analysis</u>

   A.      <u>Family Ties and Personal Circumstances</u>

   Funaro first claims that the Court should depart downward given the effect that any

incarceration will have on him and on his wife, children, and family.  <u>See</u> Memorandum at 16-

25.  The Government does not dispute that Funaro is a loving husband and father.  However,

Funaro's family ties and personal circumstances are not so exceptional that they warrant a

departure from the Guidelines Sentencing Range.

   The Sentencing Guidelines dictate that "family ties and responsibilities ... are not relevant

in determining whether a sentence should be below the applicable guideline range."  U.S.S.G. §

5H1.6.  The U.S. Court of Appeals for the Second Circuit has stated that "[f]amily

circumstances, although not a forbidden basis for departing outside the Guidelines' heartland, are

a discouraged basis for departure because the [Sentencing] Commission has deemed them to be

not generally relevant."  <u>United States v. Galante</u>, 111 F.3d 1029, 1034 (2d Cir. 1997).

"Disruption of the defendant's life, and the concomitant difficulties for those who depend on the

defendant, are inherent in the punishment of incarceration."  <u>United States v. Johnson</u>, 964 F.2d

124, 128 (2d Cir. 1992).  As the Second Circuit has stated, "[t]he presence of hardship resulting

from imprisonment therefore does not warrant a downward departure.  Only if the sentencing

court determines that the hardship in a particular case is exceptional, may it depart downward on

that basis."  <u>Galante</u>, 111 F.3d at 1034.

   Funaro appears to be very involved in his children's lives.  While this is commendable, it

is not extraordinary.  This case is very different from others in which courts have departed

downward based on exceptional family circumstances.  First, the Funaro family appears to be stable enough to survive if Funaro is sentenced to a period of incarceration called for by the Guidelines Sentencing Range.  Compare United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991) (upholding downward departure where district court had concluded that "incarceration in accordance with the Guidelines might well result in the destruction of an otherwise strong family unit"); Galante, 111 F.3d at 1035 (upholding family circumstances departure where the "sentencing court thought that if defendant were imprisoned the family unit would probably be destroyed").  Second, Lisa Funaro is now working as a financial analyst.  It therefore seems unlikely that without Funaro present to earn an income the family will be forced to go on state assistance.  Compare Galante, 111 F.3d at 1035 (stating that sentencing court believed that if the defendant were imprisoned, the defendant's wife and children would be relegated to public assistance).  Third, two of the three Funaro children are in their late teenage years and the third child is 12 years old.  Thus, there is no issue of incarcerating a single parent providing care for infants or toddlers.  Compare Johnson, 964 F.2d at 130 (finding that defendant's children and a grandchild could not be taken care of at all if the defendant were removed from the family unit for a time).

Although everyone concerned with this case wishes Michael Funaro a complete and speedy recovery from his illness, there is insufficient evidence in the record for the Court to conclude that Michael's condition constitutes an extraordinary circumstance warranting a lesser sentence for his father.  There is no suggestion that Edmund Funaro, Jr. is an irreplaceable part of Michael's treatment.  Michael, who is 19 years old, will have his mother and undoubtedly

numerous extended family members in Connecticut present to help him get through his illness.[2]

Thus, a downward departure is not warranted.  See United States v. Sweeting, 213 F.3d 95, 108-

09 (3d Cir. 2000) (finding downward departure inappropriate for defendant whose son suffered

from Tourette's Syndrome where evidence did not indicate defendant was only person who could

care for son); compare United States v. Haversat, 22 F.3d 790, 797 (8th Cir. 1994) (finding

downward departure warranted where defendant played irreplaceable role in treatment of

severely mentally ill spouse and spouse's doctor had "grave clinical concerns that [wife's]

medical management could be safely continued without the ongoing presence of her spouse")

(internal citation omitted).

### B.     Charitable Works and Community Service

Funaro also claims that his charitable works and status as a community employer warrant

a downward departure.  See Memorandum at 25-32.  The Government respectfully submits that

Funaro's volunteer efforts with the Boy Scouts and coaching youth sports are not extraordinary

and therefore should not be the basis for a downward departure.  In addition, Funaro's arguments

concerning Visels Pharmacy ("Visels") as a community employer and the effect of his

incarceration on the continuing viability of Visels are unpersuasive.

The Sentencing Guidelines make clear that  "[m]ilitary, civic, charitable, or public service

... and similar prior good works are not ordinarily relevant in determining whether a sentence

should be outside the applicable guideline range."  U.S.S.G. § 5H1.11.  A "good works"

departure is a "discouraged basis for departure."  United States v. Gaines, 295 F.3d 293, 303 (2d

---

[2]     Funaro's sentencing memorandum states that Michael completed a course of treatment in April 2005, but does not provide any information on Michael's current prognosis.  See Memorandum at 22.

Cir. 2002). Only if a defendant's conduct was so extraordinary that it falls outside of the heartland of cases covered by the Guidelines is a downward departure warranted. See United States v. Rioux, 97 F.3d 648, 663 (2d Cir. 1996); see also United States v. Wright, 363 F.3d 237, 249 (3d Cir. 2004) ("It is ... only when an individual goes well beyond the call of duty and sacrifices for the community that a downward departure may be appropriate.").

Funaro has been involved with the Boy Scouts and in coaching youth sports in Killingworth. See Memorandum at 25 & Exs. B & C. While these activities are worthwhile, they are not extraordinary. Moreover, being a Boy Scout leader and sports coach when one's children are involved in those activities benefit more than just one's own children, but often are intended first and foremost as a way of connecting with one's children. The record does not reflect a commitment to community service when Funaro's own children are not among the direct beneficiaries of his efforts.

The Court also should give little, if any, weight to the fact that Funaro is a part owner of Visels, which is located at 714 Dixwell Avenue in New Haven, near the New Haven-Hamden line. While Visels is located in a low-income neighborhood, it is a for-profit business and apparently has provided the families of Edmund Funaro, Sr. and Edmund Funaro, Jr. with comfortable lifestyles in Cheshire and Killingworth, respectively.

Funaro's concerns about the future of Visels without him present seem overblown. See Memorandum at 28-31. Visels has apparently survived for more than 20 months without Funaro functioning as a pharmacist or even as a pharmacy technician. There is no reason to believe that Visels cannot hire someone to assume Funaro's current duties at Visels for the period of time he is incarcerated.

It also is fallacious for Funaro to argue that his father's inability to continue working indefinitely as a pharmacist at Visels is a reason to give him a reduced sentence. Funaro has been convicted of 27 serious drug felonies. Even if Funaro is not incarcerated by this Court, the Connecticut Commission on Pharmacy might not grant him a new license to practice pharmacy. Moreover, even if the State pharmacy commission one day acts favorably on a petition by Funaro to restore his license, there remain other potential collateral consequences that likely will make it difficult, if not impossible, for Funaro to function effectively as a pharmacist at Visels. See 21 C.F.R. § 1301.76 (prohibiting DEA registrants, such as pharmacies, from employing, "as an agent or employee who has access to controlled substances, any person who has been convicted of a felony offense relating to controlled substances")[3]; 42 U.S.C. § 1320a-7(a)(4) (mandating exclusion from participation in any federal health care program such as Medicare and Medicaid for any individual who has been convicted of a felony "relating to the unlawful manufacture, distribution, prescription, or dispensing of a controlled substance").[4] Thus, it appears likely that, if Visels is going to survive in the long run as a family business owned by the Funaros, it will have to replace Funaro, Sr. with a pharmacist other than Funaro, Jr., whether or not the latter is incarcerated. Presumably, there are already other pharmacists working regularly at Visels unless

---

[3]    While this DEA regulation would not prohibit Funaro from dispensing non-controlled substances at Visels, it nonetheless would make it difficult for Funaro to staff the pharmacy counter at Visels by himself. Those individuals who presented prescriptions for controlled substances would either have to return at another time when a pharmacist was on duty who could fill their prescriptions, or Visels would have to keep an eligible pharmacist on duty along with Funaro at any given time.

[4]    Given Visels' location in a low-income neighborhood, it stands to reason that a significant portion of its customer base is covered by Medicare or Medicaid. If Funaro is excluded from acting as a Medicare and Medicaid provider, that exclusion will significantly hinder his ability to work as a pharmacist at Visels.

Funaro, Sr. is working all day every day.  Keeping these non-family pharmacists on staff and hiring a non-family pharmacist eventually to replace Funaro, Sr. may cut into Visels' bottom line, but it seems unlikely that these developments will cause Visels to go out of business.  However, if it turns out that the Funaro family cannot afford to employ only non-family pharmacists in the long run, the business presumably can be sold for value.  The Funaros have demonstrated for more than 40 years that Visels is a viable business.  It is hard to believe that the Funaros would not be able to find a buyer if they put Visels up for sale.[5]

Letters provided by the defense reflect that some people in the neighborhood have good feelings about Visels and that in some ways Visels has contributed to that neighborhood.  See Memorandum at 27-28 & Ex. B.  However, as the trial in this case demonstrated, Funaro and Visels failed the neighborhood in a disturbing way by filling illegitimate prescriptions for controlled substances written by Dr. William Massie between March 1998 and June 2000.[6]  Dr. Massie can only be described as a menace to the neighborhood.  By enabling Dr. Massie to feed the addictions of residents of Visels' immediate neighborhood as well as other neighborhoods in

---

[5]     Visels' accountant, Stephen Marcarelli, has opined that no national pharmacy chain would consider entering Visels' neighborhood.  See Memorandum at 28 & Ex. B. Notwithstanding Marcarelli's apparent lack of qualifications to render such an opinion, the Court should note that there is a FamilyMeds pharmacy located a few blocks away from Visels at 340 Dixwell Avenue in New Haven. According to information available on FamilyMeds' web site, the company operates retail pharmacies in 13 states, including 36 locations in Connecticut.  See http://www.familymeds.com/familymeds/aboutus.asp?aboutCat=Retail+Locations&state=CT (last visited Aug. 1, 2005).  In addition, there are Rite Aid, CVS, and Stop and Shop pharmacies all located less than one mile north of Visels on Dixwell Avenue in Hamden, as well as Rite Aid and Shaw's pharmacies located less than 1.5 miles south of Visels in New Haven.

[6]     The March 1998 date happens to be the point in time at which the investigators started their analysis.  There is no reason to believe that Massie's and Funaro's illegal conduct began coincidentally at that time.  Rather, it is very likely that Funaro and others at Visels filled many additional illegitimate Massie prescriptions in the years leading up to March 1998.

New Haven and around the county, Funaro showed that his concern for Visels' neighborhood and the region is superficial at best. In short, it would be troubling if the Court discounted the serious damage Funaro did to Visels' neighborhood and elsewhere, and instead departed downward because he has coached his children and other children on the playgrounds of Killingworth.

### C.    Extraordinary Physical Impairment

Funaro next argues that his health concerns warrant a downward departure. See Memorandum at 33-37. This argument also is unavailing.

The United States Sentencing Commission's policy statement regarding physical impairment as a factor in considering departures from the applicable Guidelines Sentencing Range states in relevant part:

> Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure may be warranted. However, an *extraordinary* physical impairment may be a reason to depart downward; e.g., in the case of a *seriously infirm* defendant, home detention may be as efficient as, and less costly than, imprisonment.

U.S.S.G. § 5H1.4 (emphasis added).

"Section 5H1.4 of the Sentencing Guidelines restricts departures based on physical condition to defendants with an 'extraordinary physical impairment,' such as those which render a defendant 'seriously infirm.'" United States v. Altman, 48 F.3d 96, 104 (2d Cir. 1995). With respect to discouraged factors such as physical condition, "the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Koon v. United States, 518 U.S. 81, 96 (1996).

In <u>United States v. Persico</u>, 164 F.3d 796 (2d Cir. 1999), the Court of Appeals stated that the "standards for a downward departure on medical grounds are strict," and cited <u>Altman</u> for the proposition that "extraordinary physical impairment" under the Guidelines refers to medical conditions that the Bureau of Prisons ("BOP") is unable to accommodate. <u>Id.</u> at 806 (citing <u>Altman</u>, 48 F.3d at 104); <u>see also</u> <u>United States v. Martinez</u>, 207 F.3d 133, 139 (2d Cir. 2000) (suggesting that an ailment should not qualify for a physical impairment departure if it can be adequately cared for within the prison system).

Funaro points to two medical conditions as grounds for departure: (1) an ileostomy resulting from surgery related to ulcerative colitis, which requires attention to Funaro's diet and to the skin around his abdominal stoma; and (2) ankylosing spondylitis and sacroiliitis which require medication. <u>See</u> Memorandum at 33-34. Dr. Serle Epstein's letter of December 2003 regarding the ankylosing spondylitis and sacroiliitis is silent as to whether those conditions would be worsened if Funaro were incarcerated. Dr. Frank Troncale's letter of January 2004 regarding the ileostomy states that Funaro may not fare well in prison and recommends "compassionate consideration in any sentencing deliberations." Memorandum at 34 & Ex. E.

Notwithstanding Dr. Troncale's concerns, the Court should give substantial weight to a letter from Barbara J. Cadogan, Health Systems Administrator, BOP, which is attached hereto as Exhibit 1. In her letter, Ms. Cadogan states that "BOP successfully houses and manages inmates who use a colostomy bag, and provides these inmates with a reliable supply of stoma care paraphernalia.," and would provide Funaro with healthy and nutritious food items from which he can "self-select" to meet his dietary needs. The BOP can therefore reasonably accommodate Funaro at one of its facilities. Further, BOP would set up a treatment plan to conform to Funaro's

9

medical needs and Funaro would have easy and regular access to BOP's accredited health institutions and other local health care providers. Under <u>Persico</u>, therefore, Funaro should not qualify for an extraordinary impairment departure.

Finally, the Government's recollection is that in the course of all the pretrial proceedings and the three week trial that Funaro attended, his medical condition never once caused even a momentary delay in those proceedings. The Government does not recall any extra breaks or other modifications to the Court's trial schedule being necessary to accommodate Funaro's medical condition. Indeed, until Funaro's counsel mentioned his ailment shortly after the jury delivered its verdict, the attorneys for the Government had no idea that Funaro's medical condition was anything but normal. Especially in light of Funaro's ability to participate fully in all the proceedings in this case that have required his attendance, BOP's representation that it can accommodate Funaro in an appropriate facility is not surprising.

In sum, Funaro's medical conditions do not qualify him for a downward departure because they do not render him "seriously infirm," and BOP can provide him with the necessary care. Accordingly, the Court should not depart downward based on Funaro's physical condition.

**D.    <u>The Guidelines Range Does Not Overstate the Seriousness of the Offense.</u>**

Funaro next argues for a downward departure based on his belief that the Guidelines Sentencing Range of 78-97 months overstates the seriousness of his offense. <u>See</u> Memorandum at 37-42. This argument also lacks merit.

As discussed in the Government's Memorandum in Aid of Sentencing, the conduct that has brought Funaro before the Court for sentencing was egregious. It involved the illegal dispensation over a significant period of time of substantial quantities of highly addictive

controlled substances.  It is incorrect to claim, as Funaro does, that this case is somehow less serious than cocaine or heroin distribution cases because it involves drugs that are lawful if used properly.  See Memorandum at 42.  The point is that here the drugs were prescribed and dispensed for no legitimate medical purpose.  As Dr. James O'Brien testified at trial, when used improperly, narcotics like Percocet and Vicodin are very dangerous.  The dangerous nature of these drugs is one reason why courts have found illegal distribution/dispensation cases involving doctors and pharmacists to be in the "heartland" of criminal cases brought under 21 U.S.C. §§ 841 and 846.  See, e.g., United States v. Steele, 178 F.3d 1230, 1238-39 (11th Cir. 1999); United States v. Limberopoulos, 26 F.3d 245, 250 (1st Cir. 1994).

In addition, the 78-97 month range takes a conservative view of the relevant conduct in this case.  Funaro told the agents conducting an audit of Visels in April-May 1999 that Massie's patients had drug problems and were questionable.  When asked why he filled Massie's prescriptions for controlled substances if Massie's patients had drug problems and were questionable, Funaro told the agents that it was their job to police Massie, not his, and that if they were not going to do anything about Massie, he would continue to fill Massie's prescriptions as long as Massie was licensed and had a controlled substance registration.  In other words, Funaro acknowledged to the agents that he knew Massie was a problem in general, not just when he issued prescriptions that were too early or were therapeutically duplicative.  However, the approximate 115 kg of marijuana equivalency from which the 78-97 month range is derived represents only the approximately 280 early fillings and therapeutic duplications that Funaro personally dispensed.  Given Funaro's status as part owner and the manager of Visels, and given his admissions to the agents concerning Massie's patients generally, the Court arguably could

conclude that many more of the 3052 Massie prescriptions filled by Visels' pharmacists between March 1998 and June 2000 should be taken into account in arriving at Funaro's relevant conduct calculation. Neither the Government nor the Probation Office has recommended such an approach. However, when one considers that the 78-97 month range is based only on approximately 9.3 percent of the Massie controlled substance prescriptions filled at Visels during the relevant period, the 78-97 month range begins to appear, if anything, to understate the seriousness of Funaro's conduct.[7] It certainly does not overstate it.

Three of the other cases on which Funaro relies involve criminal history category departures in which the courts by definition considered defendants' *prior* offenses in determining whether their criminal history category substantially overstated the seriousness of the defendants' records and their likelihood of recidivism. See United States v. Rivers, 50 F.3d 1126, 1127 (2d Cir. 1995); United States v. Williams, 78 F. Supp. 2d 189, 191 (S.D.N.Y. 1999)[8]; United States v. McFarland, 1992 WL 395589, at *1 (S.D.N.Y. Dec. 11, 1992). Those cases are plainly distinguishable from Funaro's, which requires an analysis of whether the Guidelines calculation overstates the seriousness of the *instant* offense conduct and relevant conduct.

United States v. Ramirez, 792 F. Supp. 922 (E.D.N.Y. 1992), also is readily distinguishable. The defendant there was raised under difficult family circumstances, including

---

[7]     For this and other reasons, Funaro's reliance on United States v. Lara, 47 F.3d 60 (2d Cir. 1995), is misplaced. In Lara, the Court of Appeals affirmed a downward departure on the ground that the Guidelines in force at the time of the offense may have overstated the culpability of those defendants whose conduct placed them at the high end of the drug-quantity table, given the quantity of drugs distributed and the length of time in which they were distributed. Id. at 66-67. Funaro hardly is at the high end of the drug-quantity table.

[8]     The Court of Appeals subsequently disapproved of Williams' holding in United States v. Mishoe, 241 F.3d 214, 218 (2d Cir. 2001).

12

watching his father beat his mother.  Id. at 922.  At the age of 18, when two older men bought

him clothes and impressed him with their money, the defendant "stumbled" into criminal activity

"awkwardly [and] naively."  Id. at 922-23 (citation omitted).  The court departed downward on

several grounds, including lack of guidance, aberrant behavior, and vulnerability in prison given

that he resembled a 14 or 15 year-old boy.  See id. at 923.  Far from being an impressionable

young man from a broken home, Funaro grew up in a happy, stable family and is an educated,

trained professional.  See PSR ¶¶ 49, 60-63.  Funaro was in his late thirties and had

approximately 15 years of experience as a pharmacist when the offense conduct began in March

1998.  See PSR ¶¶ 61-62.

Finally, it is useful to recall the testimony that defense expert and former high-ranking

DEA official John Mudri provided at the suppression hearing on October 2, 2002.  Based on his

review of records provided to him by the defense, Mudri essentially criticized the DEA and State

Drug Control agents who handled the instant case for not targeting Funaro earlier than they did.

Pages 62-64 (direct examination):

> Q: And can the diversion investigation into the doctor implicate the pharmacist
> even if there is not overt collusion between the pharmacist and the physician?
> A: Yes, sir.
> Q: And how can that be?
> A:  Well, on the basis of the corresponding responsibility for the pharmacist to
> make sure that a prescription is written for a legitimate medical purpose.
> Q: So if I understand what you're saying, the pharmacist has an independent duty
> or requirement under the CFR?
> A: Yes, sir.  He can't – if he's receiving a lot of prescriptions from a physician, he
> just can't turn his back to it and accept those prescriptions without questioning
> their validity.  I think there's some precedent case law on that even with regards to
> cases that are similar.
> Q: If you factor in the CFR that you've testified about – withdraw that.  Direct
> your attention to Defense Exhibit 28.  Going down to the third paragraph from the
> bottom, the following is a list of indicia which may indicate that a purported

prescription order was not issued for legitimate medical purpose in the course of professional practice. Do you see that?
A: Yes, sir.
...
Q: Now, could you just tell us briefly, when we say indicia, what does that mean in laymen's terms?
A: I think guidelines for the conduct of the proper filling of a prescription.
Q: So these indicia that are listed there, in terms of the prescriber writing significantly larger number of prescription orders or larger quantities, that is an indicia or evidence of diversion activity, correct?
A: Yes, sir.
Q: And that would be diversion activity against both the doctor and the pharmacist filling the prescription, correct?
A: Yes, sir.
Q: And going up to the top of the next page, patients appearing to be returning too frequently. That would be indicia of a diversion activity, correct?
A: Yes, sir.
Q: And that would apply to both the physician and the pharmacist, correct?
A: Correct.
Q: And dropping down, number of people appearing simultaneously within a short time. Indicia of the illegal diversion activity, correct?
A: Yes, it could be.
Q: And that would apply to both the physician and the pharmacist filling it, correct?
A: Correct.
Q: Now when you reviewed these documents and these exhibits, did you find instances of these indicia in the diversion investigation into Dr. Massie?
A: Yes, I did.

Page 66 (direct examination):

Q: So based on, again, your review of these exhibits and the information contained in there setting forth the diversion investigation, based upon the CFR, based upon the DEA registrant facts of indicia, based upon the indicia that you found in the exhibits, did you reach a conclusion with respect to whether there was diversion activity with respect to Dr. Massie and the pharmacists?
A: In my opinion there definitely was with Dr. Massie and possibly there with the pharmacy.

Pages 73-74 (direct examination)

Q: Would the pharmacist be subject to criminal prosecution or exposure to which you're referring?

14

A: He could be, yes.

Q: And what would be the basis that he could?

A: In a situation of a doctor case like this, he could be knowingly filling those prescriptions knowing full well that they're not for a legitimate medical purpose.

Q: And you're referring, when you say knowingly, to the CFR, correct?

A: Correct.

Q: Now, when you say knowingly filling them, one of the basis for knowingly filling them under the CFR are the indicia that's listed?

A: Yes.

Q: So that if the indicia are met in a particular case, then the physician – I'm sorry – the pharmacist could be prosecute [sic] for, quote, knowingly filling those prescriptions.

A: That's correct....

Q: And as a matter of fact, when one looks at Defense Exhibit 28, the CFR, the second full paragraph, is that to what you're referring where there's language about deliberately turning the other way?

A: Yes, sir.

Pages 88-89 (direct examination):

Q: What in paragraph ten [of Defense Exhibit 10] forms the basis for [Mr. Mudri's] opinion that the purpose of the audit of Visels shifted at some point from administrative to criminal?

....

A: ... The first sentence [of Defense Exhibit 10] refers to during the course of reviewing prescriptions the investigators found a large quantity of controlled substance prescriptions written by William Massie, M.D.

Q: And the second sentence?

A: It's in furtherance of. That obviously they talked to Mr. Funaro and he indicated that 99 percent of Massie's patients received large quantities of controlled substances.

Q: Why would those two statements contained in paragraph ten furnish a basis for your opinion that assuming the entry started out as routine investigatory it shifted at some point from administrative to criminal purpose?

A: Because you're talking now about outside the course of legitimate practice here. You're talking about possible diversion of controlled substances based on the pharmacists [sic] corresponding liability.

Page 115 (cross-examination):

Q: So had you been in charge of this investigation when you saw the information as it was unfolding, it's possible you might have decided to identify Mr. Funaro, Jr. as a subject or target back as early as 1999, right?

A: I definitely would have, yes.

Pages 122-23 (cross-examination):

Q: ... Do you think given what Agent Levin saw at Visels during that audit, and what Mr. Funaro himself allegedly told Agent Levin, do you think that instead of treating this administratively in closing out the complaint investigation, do you think that Mr. Levin should have opened a criminal investigation on Visels at that time for potentially participating in a diversion.
A: Yes, sir.

Given that Funaro's expert witness believed that Funaro's conduct through April 1999 in filling Massie prescriptions *generally* was plainly serious enough to warrant a criminal investigation right then and there, it is odd that Funaro now argues that a Guidelines Sentencing Range which takes into account only a portion of that same conduct (early fills and therapeutic duplications personally dispensed by Funaro) overstates its seriousness.

## II.    Section 3553(a) Factors

Funaro also analyzes the various sentencing factors listed in 18 U.S.C. § 3553(a) as they apply to his sentencing.  See Memorandum at 42-49.  The Government has addressed in Part I above most of the arguments Funaro makes in his analysis under section 3553(a).  However, a response to footnote 20 on page 48 of Funaro's sentencing memorandum is in order.

The distinction between Funaro and the three other co-defendant pharmacists is not only that Funaro "put the Government to its proof," Memorandum at 48 n.20, whereas the other pharmacists pled guilty, but also that the others pled guilty to different charges than those of which Funaro was convicted.  Defendants Melanidis, Santa, and Wozniak each pled guilty to one count of violating 18 U.S.C. § 1001, while Funaro was convicted of 27 counts of violating 21 U.S.C. § 841(a)(1).

16

It is true that judges are instructed to consider as a sentencing factor "the need to avoid unwarranted sentence disparities among defendants with similar records who have been *found guilty of similar conduct*." 18 U.S.C. § 3553(a)(6) (emphasis added).  However, when one defendant pleads guilty to a lesser offense and a co-defendant is convicted of a more severe crime, any resulting sentencing "disparity" does not implicate the concerns set forth in section 3553(a)(6).  Cf. United States v. Contreras, 108 F.3d 1255, 1271-72 (10th Cir. 1997) (in Sentencing Guidelines case, reversing downward departure as an abuse of discretion because "[c]o-defendants who are charged with and convicted of different offenses are not 'similarly situated'"); United States v. Butt, 955 F.2d 77, 90 (1st Cir. 1992) (same).  Because Funaro was convicted of Title 21 drug offenses and the three co-defendant pharmacists were convicted of Title 18 false statement charges, they are not similarly situated so as to warrant consideration of whether a longer sentence for Funaro would constitute a sentencing disparity.

To be sure, the other three pharmacists charged in this case, like Funaro, filled many illegitimate Massie prescriptions.  However, none of the others gave incriminating statements admitting their knowledge that Massie's patients were drug addicts and stating that they knew they should not be filling prescriptions early.  In addition, unlike Funaro, none of the other three pharmacists were part owners of the pharmacies at which they were working at the time of the offense.  These facts set Funaro apart somewhat from the co-defendant pharmacists.

To the extent Funaro implicitly is claiming that a prison sentence would penalize him for taking the case to trial, it is important to recall that the other pharmacists also were each initially charged with Title 21 drug offenses.  Rather than penalizing Funaro for taking the case to trial, the Government in effect rewarded the other three pharmacists for not putting the Government to

its proof on Title 21 charges by agreeing to resolve their cases by way of substitute informations charging the false statement offense.  As Funaro implicitly acknowledges, the Government was prepared to resolve the case against him on similar terms.  See Memorandum at 4 n.4.  Any "disparity" with the other pharmacists' sentences that may result from Funaro's decision to try the Title 21 charges is completely of his own making and should not be a factor in the Court's sentencing determination.

## Conclusion

For the foregoing reasons, the Government submits that the Court should deny Funaro's request for a downward departure or a non-Guidelines sentence.  Given the totality of the circumstances, a sentence at the low end of the confinement range of 78-97 months would seem to be appropriate in this case.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

/s/
By:     DAVID VATTI
        Assistant United States Attorney
        Federal Bar No. ct11957

For:    JONATHAN BIRAN
        Assistant United States Attorney
        Federal Bar No. ct21922
        United States Attorney's Office
        157 Church Street, 23rd Floor
        New Haven, CT 06510
        (203) 821-3700
        Email: jonathan.biran@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on August 1, 2005, a copy of the foregoing was served on the

following persons:


Alan J. Sobol, Esq. (by fax and U.S. mail)
O'Connell, Flaherty & Attmore, L.L.C.
280 Trumbull Street
Hartford, CT 06103-3598

Jacqueline Carroll (by hand delivery)
U.S. Probation Officer
U.S. Probation Office
157 Church Street
New Haven, CT 06510



                /s/
By:    DAVID VATTI
        ASSISTANT U.S. ATTORNEY

For:   JONATHAN BIRAN
        ASSISTANT U.S. ATTORNEY